In re the Commitment of Ervin Burris:

State of Wisconsin, Petitioner-Respondent,

v.

Ervin Burris, Respondent-Appellant-Petitioner.

Supreme Court

*No. 00–1425. Oral argument September 9, 2003.—Decided June 30, 2004.*

2004 WI 91

(Also reported in 682 N.W.2d 812.)

298

300

CROOKS, J., concurs.
BRADLEY, J., joins.
ABRAHAMSON, C.J., dissents.

For the respondent-appellant-petitioner there were briefs by *Joseph L. Sommers,* Madison, and oral argument by *Joseph L. Sommers.*

For the petitioner-respondent the cause was argued by *Warren D. Weinstein,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals, *State v. Burris,* 2002 WI App 262, 258 Wis. 2d 454, 654 N.W.2d 866, which affirmed the circuit court's revocation of petitioner's supervised release under Wis. Stat. ch. 980 (1997–98).[1] The principal issue presented is whether a circuit court is required to expressly consider alternatives to revocation before revoking a sexually violent person's supervised release when the court makes a determination that "the safety of the public requires [the person's] commitment to a secure facility." This issue implicates due process, statutory interpretation,

---

[1] All further references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

and public policy. The petitioner also contends that his revocation proceeding was "arbitrary and unfair" because it violated basic due process safeguards and that his revocation was not supported by the evidence.

¶ 2. We conclude that a circuit court is not required to expressly consider alternatives to revocation before revoking a sexually violent person's supervised release when the court determines that the safety of the public requires the person's commitment to a secure facility. Such a finding mirrors a finding that "the safety of others requires that supervised release be revoked." Wis. Stat. § 980.06(2)(d). We further conclude that the proceedings in this matter were neither arbitrary nor fundamentally unfair. Consequently, we affirm the decision of the court of appeals.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶ 3. In September 1989 Ervin Burris was convicted of first-degree sexual assault of a nine-year-old child.[2] He was sentenced to prison for 10 years. This sentence was the fourth time Burris had been sent to prison for felony convictions, some of which had a sexual component.

¶ 4. In September 1996, shortly before Burris's mandatory release date, the Rock County District Attorney's office petitioned the circuit court to detain Burris as a sexually violent person under Chapter 980. The case was tried to the court in April 1997. Rock

---

[2] "Whoever has sexual contact or sexual intercourse with a person who has not attained the age of 13 years is guilty of a Class B felony." Wis. Stat. § 948.02(1) (1987–88). The requirements for first-degree sexual assault are identical today. *See* Wis. Stat. § 948.02(1) (2001–02).

County Circuit Judge James E. Welker found Burris to be a sexually violent person,[3] and committed him to the Department of Health and Family Services (DHFS) with instructions that DHFS prepare a plan for the defendant's supervised release. The State appealed the court's placement decision but the circuit court was affirmed.[4]

---

[3] " 'Sexually violent person' means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect or illness, and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence. Wis. Stat. 980.01(7) (1997–98). The same language appears in current law. Wis. Stat. 980.01(7) (2001–02).

[4] Following Judge Welker's decision to place Burris on supervised release rather than in an institutional setting, the State appealed, arguing that Burris belonged in a confined setting. *In re the Commitment of Burris,* No. 97–3153, unpublished slip op. at 1 (Wis. Ct. App. May 27, 1999). Burris cross-appealed on the theory that the court had insufficient evidence to conclude that he had a "mental disorder" or that it was "substantially probable that [he] will engage in acts of sexual violence." *Id.* The court of appeals affirmed the circuit court's decision. *Id.* at 7.

Following a 1999 amendment to Chapter 980, a circuit court is now required to order that an individual who is found to be a sexually violent person be "placed in institutional care." *See* 1999 Wis. Act 9, § 3223h; *see also State v. Rachel,* 2002 WI 81, ¶ 68, 254 Wis. 2d 215, 647 N.W.2d 762 (concluding that this amendment to Chapter 980, limiting a sexually violent person's ability to seek supervised release, did not render Chapter 980 unconstitutional).

¶ 5. In October 1998 Burris was placed in the Rock Valley Community Corrections Program (the halfway house) in Janesville[5] at which time DHFS imposed certain "supervised release rules." A year later, in October 1999, DHFS amended the supervised release rules, and Burris acknowledged in writing that he had received a copy. The revised rules contained the following restrictions:

> 1. You shall avoid all conduct that is a violation of federal or state statute, municipal or county ordinances or that is not in the best interest of the public's welfare or your rehabilitation.
>
> . . . .
>
> 4. You shall inform your agent of your whereabouts and activities as she/he directs.
>
> . . . .
>
> 13. You shall provide true and correct information orally and in writing in response to inquiries by the agent.
>
> . . . .
>
> 15. . . . The specific rules imposed at this time are:
>
> a) You shall not consume or possess alcohol, illegal drugs or drug paraphernalia.
>
> . . . .
>
> 18. You shall notify your agent of any involvement in an intimate relationship at its beginning and you shall

---

[5] Burris's community placement was delayed because it took the court until October 25, 1998, to find a supervised release setting that could adequately treat Burris and adequately protect the public.

introduce the person to your agent to disclose your past sexual offenses prior to engaging in any type of sexual activity with that person.

¶ 6. In December 1999 DHFS filed a petition for revocation of supervised release, charging that Burris had violated the terms and conditions of his release as set forth in the supervised release rules. This petition was later amended twice.

¶ 7. The initial petition, dated December 10, 1999, alleged that Burris violated Rule 1 in two respects: (1) Burris obtained a prescription for Viagra without his supervising agent's prior knowledge or consent; and (2) Burris refused to sign a release form allowing the department to interview the prescribing physician about the Viagra prescription.

¶ 8. The first amendment to the petition contained two additional allegations, namely: (3) Burris violated Rules 1, 4, and 13 by refusing to provide his supervising agent with a written statement about the events leading to Burris obtaining the Viagra prescription; and (4) Burris violated Rules 1, 4, and 18 by engaging in a consensual intimate relationship with a woman between October 25, 1998 and December 10, 1999, without informing his supervising agent. Although the date of this first amendment is not clear, Burris knew of the amendment as of December 28, 1999, because the parties discussed the amendment during a motion hearing that day.

¶ 9. On December 30 DHFS amended the petition a second time, charging that: (5) Burris violated Rules 1 and 15a by consuming alcohol and sharing it with another resident at the halfway house between November 3 and November 24, 1999. This second amendment also shortened the time frame within which Burris

allegedly engaged in the unauthorized intimate relationship, asserting that the period began on October 25, 1999, rather than October 25, 1998, as originally claimed.

¶ 10. On January 8, 2000, the circuit court held a hearing to determine whether Burris's supervised release should be revoked. Based on the evidence presented, Judge Welker made the following factual findings that outlined the manner in which Burris had engaged in "deceitful activity."

¶ 11. Judge Welker found that while Burris resided at the halfway house, he continued a relationship with a named married woman with children, despite his supervising agent's admonition against further contact with her. Burris not only failed to abide by the agent's instruction but also went so far as to meet the woman in a motel to have sexual intercourse. In order to meet with the woman, Burris violated the conditions of a pass provided to him, leaving the area where he was permitted to travel. Furthermore, Burris did not meaningfully participate in the sex offender treatment program as he was "secretive about what was going on in his life."

¶ 12. Judge Welker also found that Burris obtained a prescription for Viagra. While Judge Welker declined to decide whether Viagra was a prohibited substance for a sexually violent person, he indicated that Burris's reaction to being caught with the substance indicated that Burris believed his action was prohibited. Burris thus engaged in a course of deceitful conduct regarding the Viagra prescription. Furthermore, Burris was secretive and failed to cooperate with his supervising agent after the halfway house staff discovered the Viagra prescription.

¶ 13. In addition, Judge Welker found that Burris drank alcohol and arranged meetings outside the half-way house to exchange cigarettes in a way designed to avoid detection by surveillance cameras. The court noted the significance of this conduct in light of Burris's history of drug and alcohol abuse.

¶ 14. Based on the conduct involved in these rule violations, Judge Welker revoked Burris's supervised release, saying:

> Mr. Burris's conduct represents an example of rather extreme compulsive behavior[.] [G]iven the fact that he was released under the conditions that he was, he had the strongest incentive to follow every rule, dot every I, cross every T, do what he was supposed to do, and he did not do that. He engaged in, as I say, deceitful activity. He skirted the rules as best he could, and his history with that compulsive behavior, his history makes him an extreme risk for harm to the public if there is not significantly more control exercised over his activities than have been exercised in the past.
>
> He's had a history of drug and alcohol abuse. He's had a history of forcible sexual activity. He's had a history of sex with children. And he has mixed all of those elements, and he clearly does not have the ability to control his own antisocial urges and desires, based upon what I conclude to be an extremely compulsive behavior, compulsive personality.
>
> I conclude that this compulsive behavior which makes him unable to control his own action coupled with the fact that he has this history of violent sexual activity and sex with children creates *a high likelihood that his compulsive behavior will manifest itself in sexually violent behavior* which is harmful to the public in the future *if there are not significant more controls imposed upon him.* And *I do not think that the public can be protected in his present placement* because of his,

number one, refusal to obey the directives of his agent; number two, his refusal to be candid in sex offender treatment; number three, his refusal to follow the rules during temporary releases which were designed to transition him into the community; and, number four, his refusal to be candid with his agent particularly involving matters of his sex life.

. . . .

*I believe that the safety of the public requires his commitment to a secure facility,* and I am going to order that the prior order of this Court is modified to provide that he is committed to the Wisconsin Resource Center for commitment and treatment until such time as it's safe to release him into the public. (Emphasis added).

¶ 15. The circuit court rejected Burris's post-revocation motion claiming ineffective assistance of counsel and inadequate notice. Burris appealed the revocation of his supervised release, arguing that Rule 1 of his supervised release rules was unconstitutionally vague, that the petition to revoke his supervised release provided insufficient notice of the allegations against him, and that Judge Welker erred because he did not consider alternatives to revocation before revoking his supervised release. *Burris,* 258 Wis. 2d 454, ¶ 1. The court of appeals affirmed. *Id.* We accepted Burris's petition for review and now affirm the decision of the court of appeals.

## ANALYSIS

¶ 16. Chapter 980 creates statutory civil procedures for a court to commit a sexually violent person to the custody of DHFS "for control, care and treatment until such time as the person is no longer a sexually

violent person." Wis. Stat. § 980.06(1).[6] Until the law was changed in 1999,[7] the court was authorized to place a sexually violent person on supervised release at the time of the person's initial commitment. Wis. Stat. § 980.06(2)(b). When this occurred, the person was placed in the custody and control of DHFS and was "subject to the conditions set by the court and to the rules of the department." Wis. Stat. § 980.06(2)(d).[8] Supervised release also came into play when a sexually violent person was committed to an institution under § 980.06 and, after a period of confinement, petitioned for supervised release. Wis. Stat. § 980.08. This latter feature is still part of the law.[9]

¶ 17. Understandably, Chapter 980 also provided procedures for the revocation of supervised release. Former Wis. Stat. § 980.06(2)(d) read in part:

> The state has the burden of proving by clear and convincing evidence that any rule or condition of re-lease has been violated, or that the safety of others requires that supervised release be revoked. If the court determines after hearing that any rule or condition of release has been violated, or that the safety of others requires that supervised release be revoked, it may revoke the order for supervised release and order that the released person be placed in an appropriate insti-tution until the person is discharged from the commit-ment under s. 980.09 or until again placed on super-vised release under s. 980.08.[10]

---

[6] *See* Wis. Stat. § 980.06 (2001–02).

[7] 1999 Wis. Act 9, § 3223L.

[8] *See* Wis. Stat. § 980.08(6m) (2001–02).

[9] *See* Wis. Stat. § 980.08 (2001–02).

[10] *See* Wis. Stat. § 980.08(6m) (2001–02).

¶ 18. Under § 980.06(2)(d), the court could revoke a person's supervised release if it determined that (1) any rule or condition of release had been violated; or (2) the safety of others required that supervised release be revoked.

¶ 19. Two terms ago, in *State v. Keding,* 2002 WI 86, ¶ 1, 254 Wis. 2d 334, 646 N.W.2d 375, this court considered as a certified question, whether a circuit court is required to consider alternatives to revocation before revoking a sexually violent person's supervised release under Chapter 980. The court split evenly on this issue, but it affirmed Lenny Keding's revocation because a majority agreed that the circuit court had investigated alternatives to revocation before revoking Keding's supervised release. *Id.,* ¶¶ 2–3.

¶ 20. In this case, the issue is narrower than the issue in *Keding. See Burris,* 258 Wis. 2d 454, ¶ 19. Judge Welker revoked Burris's supervised release on grounds that the "safety of the public required [Burris's] commitment to a secure facility." This finding mirrored the second ground for revoking supervised release, namely, "that the safety of others requires that supervised release be revoked." Wis. Stat. § 980.06(2)(d). Hence, the specific issue presented in this case is whether the court must, for any reason, expressly consider alternatives to revocation before revoking supervised release when the court determines that the safety of others *requires* revocation, or when the safety of others *requires* a person's commitment to a secure facility.

A. Due Process

¶ 21. Burris contends that due process required the circuit court to expressly consider and reject alternatives to revocation before revoking his supervised

310

release. He relies on *State ex rel. Plotkin v. Department of Health & Social Services,* 63 Wis. 2d 535, 217 N.W.2d 641 (1974), to support this contention.

¶ 22. An alleged sexually violent person, subject to commitment under Chapter 980, is not a criminal defendant but has the same constitutional rights as a criminal defendant at trial. *State ex rel. Seibert v. Macht,* 2001 WI 67, ¶ 12, 244 Wis. 2d 378, 627 N.W.2d 881, as revised in *State ex rel. Seibert v. Macht,* 2002 WI 12, ¶ 2, 249 Wis. 2d 702, 639 N.W.2d 707; Wis. Stat. § 980.05(1m). Moreover, the court of appeals has concluded that procedural due process protections afforded to persons in probation and parole revocation proceedings also apply in supervised release revocation proceedings under Chapter 980. *See State v. Van-Bronkhorst,* 2001 WI App 190, ¶ 9, 247 Wis. 2d 247, 633 N.W.2d 236.

¶ 23. Burris asserts that due process protections afforded in probation and parole revocation proceedings *include* a requirement that the decision-maker consider alternatives to revocation. For this proposition, he points to *Plotkin.* This, however, is where his analysis breaks down.

¶ 24. The law has evolved as follows: In *Morrissey v. Brewer,* 408 U.S. 471 (1972), the United States Supreme Court considered whether due process required a state to afford an individual some opportunity to be heard before revoking his parole. The Iowa Board of Parole had revoked the parole of two parolees without providing them an adversary hearing. The Court stated that the full panoply of rights due a defendant in a criminal proceeding did not apply to parole revoca-

tion, *id.* at 480; rather, the minimum requirements of due process required the following:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Id.* at 489.

¶ 25. These due process protections were extended to probation revocation hearings in *Gagnon v. Scarpelli,* 411 U.S. 778, 782 (1973), along with a recognition that the state must provide counsel to probationers in some revocation proceedings.

¶ 26. Twelve years later, the Supreme Court confronted the question whether *Morrissey* and *Gagnon* required a court to consider alternatives to incarceration before revoking probation. The Court concluded that due process did not require the trial court to consider alternatives to revocation and indicate on the record that it had done so. *Black v. Romano,* 471 U.S. 606 (1985). The Court said: "One point relevant to the present case is immediately evident from a review of the minimum procedures set forth in some detail in *Gagnon* and *Morrissey: the specified procedures do not include an express statement by the factfinder that alternatives to incarceration were considered and rejected." Id.* at 612 (emphasis added).

¶ 27. The Court acknowledged the *desirability* of considering possible alternatives to imprisonment be-

312

fore probation is revoked, *id.* at 613, but it emphasized that the "decision to revoke probation is generally predictive and subjective in nature," *id.,* and "a general requirement that the factfinder elaborate upon the reasons for a course not taken would unduly burden the revocation proceeding without significantly advancing the interests of the probationer." *Id.*

¶ 28. There is an exception to this rule. In *Bearden v. Georgia,* 461 U.S. 660 (1983), the Supreme Court held that in probation revocation proceedings, a sentencing court must inquire into the reasons for failure to pay a fine and restitution if that failure is the ground for revocation. "If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternative measures of punishment other than imprisonment." *Id.* at 672. The Court added that only if alternative measures are not adequate to meet the state's interests "may the court imprison a probationer who has made sufficient bona fide efforts to pay." *Id.* The Court later explained that the decision in *Bearden* "did *not* rest on the view that *Gagnon* and *Morrisey* generally compel consideration of alternatives to incarceration." *Black,* 471 U.S. at 614 (emphasis added). Rather, it indicated that such consideration "is required only if the defendant has violated a condition of probation through no fault of his own." *Id.*

¶ 29. In *Plotkin,* decided in 1974 after the State of Wisconsin lost the *Gagnon* case in the Supreme Court, this court approved and adopted Section 5.1 of the American Bar Association's *Standards Relating to Probation.* 63 Wis. 2d 544–45. Section 5.1 established "[g]rounds for and alternatives to probation revocation." *Id.* at 544. The section provided these grounds for revocation:

(i) confinement is necessary to protect the public from further criminal activity by the offender; or

(ii) the offender is in need of correctional treatment which can most effectively be provided if he is confined; or

(iii) it would unduly depreciate the seriousness of the violation if probation were not revoked.

*Id.* More important for this case, the standards provided that the court find one of these three grounds for revocation *after considering various intermediate steps as an alternative to revocation. Id.* at 544–45.

¶ 30. In *Plotkin,* this court adopted these standards for probation revocation, not as a requirement of due process but as a prescription of good policy.[11] Thus, reasoning by analogy, we conclude that *due process* does not require that a court expressly consider and reject alternatives to revocation before revoking a sexually violent person's supervised release when the court determines that the public safety requires the person's commitment to a secure facility.

B. Statutory Interpretation

¶ 31. Burris contends that Wis. Stat. § 980.06(2)(d), now § 980.08(6m), requires the court to consider alternatives to revocation in every case prior to revoking a sexually violent person's supervised release. This presents a question of statutory interpretation that we review de novo. *Keding,* 254 Wis. 2d 334, ¶ 13.

---

[11] The court adopted similar standards for parole revocation in *Van Ermen v. Department of Health & Social Services,* 84 Wis. 2d 57, 267 N.W.2d 17 (1978).

¶ 32. This court has been wrestling with statutory interpretation in recent years, culminating in our decision in *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110. The purpose of statutory interpretation is to determine what a statute means so that it may be given its full, proper, and intended effect. *Id.,* ¶ 44. We understand our obligation to faithfully give effect to the policy choices enacted into law by the legislature. *Id.* To achieve this end, we look first to the language of the statute. *Id.* If the language is ambiguous, even after considering its intrinsic context, scope, and purpose, we may turn to extrinsic sources such as legislative history. In this instance, the statute is not ambiguous, but after stating our conclusion, we turn to the history of similar legislation to confirm our interpretation of the statutory language.

¶ 33. Under the former statute applicable in this case, the court was directed to commit a sexually violent person to the custody of DHFS for control, care, and treatment until such ·time as the person "is no longer a sexually violent person." § 980.06(1). An order for commitment was to specify either institutional care or supervised release. § 980.06(2)(b). DHFS was directed to "arrange for control, care and treatment of the person *in the least restrictive manner consistent with the requirements of the person and in accordance with the court's commitment order." Id.* (emphasis added).

¶ 34. The "least restrictive manner" language conforms to a provision in the patients rights statute, which applies to Chapter 980 patients: Each patient shall "have the right to the least restrictive conditions necessary to achieve the purposes of . . . commitment." Wis. Stat. § 51.61(1)(e). It is also consistent with *Young-*

*berg v. Romeo,* 457 U.S. 307, 321–22 (1982), where the Supreme Court said that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."

¶ 35. Wisconsin Stat. § 980.06(2)(b) was cited by this court in *State v. Carpenter,* 197 Wis. 2d 252, 266, 541 N.W.2d 105 (1995), as part of the rationale for upholding Chapter 980 as a remedial, treatment-oriented statute.

¶ 36. This discussion, grounded in the statutes, provides the policy backdrop against which Chapter 980 must be implemented and interpreted. We are fully cognizant that Chapter 980 is not intended to be a punitive statute. At the same time, the purpose of the chapter is to protect the public from sexually violent persons who have a mental disorder and whose mental disorder creates a substantial probability that they will engage in acts of sexual violence. The statute allows and common sense requires that the department and the court have reasonable latitude in trying to achieve these two objectives. "A person on supervised release is subject to the conditions set by the court and to the rules of the department." Wis. Stat. § 980.06(d).

¶ 37. Burris contends that to comply with the "least restrictive" language in the statutes, the court is required, in every case, to expressly consider alternatives to revocation before revoking a sexually violent person's supervised release. We disagree.

¶ 38. When a person is placed on supervised release, DHFS must develop a plan that identifies treatment and services the person will receive and specify who will be responsible for providing the treatment and services. Wis. Stat. § 980.06(2)(c). The plan is then

316

presented to the court for approval. *Id.* Thereafter, DHFS has latitude to control the person, care for the person, and treat the person "in the least restrictive manner *consistent with the requirements of the person* and in accordance with the court's commitment order." § 980.06(2)(b). As the requirements of the person change, the manner of control, care, and treatment may change, so long as the change does not conflict with the court's commitment order. If the court-approved plan is so restrictive that it deprives DHFS of reasonable flexibility in responding to the changing circumstances of the person, DHFS may seek added flexibility from the court. Hence, revocation of supervised release is not the only option DHFS has when a sexually violent person violates conditions or rules.

¶ 39. When the department moves to revoke supervised release on grounds that the released person has violated one or more conditions or rules, "or that the safety of others requires that supervised release be revoked," the state has the burden of proving its case by clear and convincing evidence. § 980.06(2)(d).

¶ 40. The statute does not state explicitly what the court must consider. We think it is self-evident, however, that when the court determines, on the evidence after a hearing, that "the safety of others requires that supervised release be revoked," the court has found that there is clear and convincing evidence that it has no alternative but to revoke to assure the safety of others. Put another way, the court has found that the safety of others requires the person's commitment to a secure facility because supervised release will not be adequate.

■

¶ 41. The dictionary definition of the word "require" contains such phrases as: "To have as a requi-

site," "To call for as obligatory," "To impose an obligation on; compel." *The American Heritage Dictionary of the English Language* 1533 (3d ed. 1992). If the court finds that the safety of others *compels* that supervised release be revoked, the court need not provide an explicit statement why alternatives to incarceration were considered but not selected. If the court ever has question about the need to revoke on this ground, it can find that the state has not satisfied its burden of proof, or it can proactively explore alternatives to revocation.

¶ 42. The court of appeals offered a slightly different interpretation of the statute. It noted that under the statute, the court must first determine whether any rule or condition of release has been violated or whether the safety of others requires revocation. *Burris,* 258 Wis. 2d 454, ¶ 22. "If either of these conditions is met, the circuit court 'may' revoke an order for supervised release." *Id.* "However, upon a finding that the safety of others requires revocation, the plain language of the statute removes any discretion from the circuit court. Simply stated, it is irrational to require consideration of alternatives to revocation after a court has found that the safety of others requires revocation." *Id.* We do not dispute this interpretation.

¶ 43. In examining this issue, the statutory scheme must be understood. Under the old law and under the current law, the court makes the decision whether to place a person on supervised release. When the department seeks to revoke supervised release, the court serves as a check on the department. The court cannot be expected to automatically rubber-stamp a petition to overturn its own previous determination and find that the safety of others *requires* revocation, unless the state has adduced clear and convincing evidence.

318

¶ 44. As noted, the statute also provides that if "the court determines after hearing that any rule or condition of release has been violated . . . it *may* revoke the order for supervised release and order that the released person be placed in an appropriate institution." Wis. Stat. § 980.06(2)(d) (emphasis added). Here again, the statute does not state explicitly what the court must consider or what the court must explain. However, given the wide range of potential rule violations, including the failure to pay fines and restitution, we expect courts will recognize that revocation of supervised release based upon violation of one or more conditions or rules is likely to receive much closer scrutiny than revocation based on a finding that "the safety of others requires" revocation. In such a case, a court should explore alternatives or fully explain why some step short of revocation would not be adequate.

■■■■■

¶ 45. We stated in *Keding,* 254 Wis. 2d 334, ¶ 13, that "the revocation decision itself is a discretionary one, subject to a deferential standard of review. We will uphold a circuit court's exercise of discretion if the court employs a process of reasoning based on the facts of record and reaches 'a conclusion based on a logical rationale founded upon proper legal standards' " (quoting *State ex rel. J.H. Findorff & Son, Inc. v. Circuit Court for Milwaukee County,* 2000 WI 30, ¶ 21, 233 Wis. 2d 428, 608 N.W.2d 679). "Discretion not only entails the process of decision making on the basis of the relevant facts *but also requires that the decision be consonant with the purposes of the established law or other guides to discretion." Plotkin,* 63 Wis. 2d at 545. One of the purposes of the law is to control sexually violent persons "in the least restrictive manner consistent with the requirements of the person." Wis. Stat.

§ 980.06(2)(b). When supervised release is revoked on the basis of the violation of a rule or condition of release, the court should explain its decision and square that decision with the treatment-oriented purposes of the law.

¶ 46. It must be acknowledged that the phrase "may revoke" follows a finding of a rule violation as well as a finding that "the safety of others requires that supervised release be revoked." This poses the question whether the word "may" has different applications as it is tied to different clauses in the same sentence. We believe that it does.

¶ 47. Parallel legislative history provides assistance. There is little doubt, because of consistent organization and use of language, that parts of Chapter 980 are modeled after Wis. Stat. § 971.17 entitled "Commitment of persons found not guilty by reason of mental disease or mental defect." In the 1987 statutes, Wis. Stat. § 971.17(3) speaks of revoking the conditional release of a person found not guilty because of mental disease or defect: "If . . . the court determines after a hearing that the conditions of release have not been fulfilled *and* that the safety of the person or the safety of others requires that his or her conditional release be revoked, the court shall immediately order the person recommitted to the department." (Emphasis added.).

¶ 48. In 1990 the legislature approved 1989 Act 334, a bill drafted by the Insanity Defense Committee of the Judicial Council. In that act, Wis. Stat. § 971.17 was repealed and recreated. Subsection (3)(a) provided that after a person was found not guilty of a crime by reason of mental disease or mental defect, "an order for commitment . . . shall specify either institutional care or conditional release." Wis. Stat. § 971.17(3)(a) (1991–92). Subsection (e), which closely parallels § 980.06(2)(d)

320

(1997–98), then provided for revocation of conditional release. Part of the text reads:

> The state has the burden of proving by clear and convincing evidence that any rule or condition of release has been violated, or that the safety of the person or others requires that conditional release be revoked. If the court determines after hearing that any rule or condition of release has been violated, or that the safety of the person or others requires that conditional release be revoked, it may revoke the order for conditional release and order that the released person be placed in an appropriate institution.

¶ 49. An early draft of this legislation provided, in part, that: "If the court determines after a hearing that any rule or condition of release has been violated, it may revoke the order for conditional release." Judicial Council Insanity Defense Committee File 4 of 5 (1988–1991), Document 67 (LRB 0902/1 draft dated 11/14/88). At the urging of the Department of Health and Social Services, Judge Mark Frankel asked the Insanity Defense Committee to provide more discretion to revoke the conditional release of defendants under the statute. The December 15, 1989, minutes of the committee read in part as follows:

> Ms. Greenley pointed out that proposed par. (3)(c) allows the person to be taken into custody if he or she "violates any condition or rule." This does not include the broader language suggested by Judge Frankel earlier in our deliberations, allowing the person to be taken into custody if he or she is becoming dangerous again, notwithstanding no rule or condition of supervision has been violated. Last month, a draft was circulated which includes the concept Judge Frankel suggested (LRB-2701/4). It allows a conditional released

person to be taken into custody "if the safety of the person or others requires revocation of conditional release."

Chairman Pappas said that one of our original goals in this committee had been to address that situation. He asked if there were objection to including this alternative standard for revocation. Ms. Greenley said she had no objection. The committee agreed to make this change.

. . . .

The committee continued reviewing sub. (3)(c). . . . It agreed to add the alternative "Frankel" standard to the judicial findings which support an order for revocation. When conditional release is revoked, the person must be placed in a state treatment facility.

The committee's vote led to the current language, "the safety of the person or others" being shoehorned into one sentence, with the resulting statute embodying two different grounds for revocation that are not wholly consistent. The inconsistency in § 971.17 was carried over, years later, to the revocation provision in Chapter 980, which explains why the word "may" in § 980.06(2)(d) (1997–98) and § 980.08(6m) (2001–02) may be read differently depending on context.

## C. Other Due Process Claims

¶ 50. In addition to arguing that due process requires the circuit court to consider alternatives to revoking his supervised release, Burris asserts that his due process rights have been violated because his revocation proceedings were, in his words, "arbitrary and fundamentally unfair." Burris's perception appears to originate in large part from his belief that he was

entitled to a due process right to have the court consider and reject alternatives to revocation. However, he weaves in other concerns that require discussion. He raises issues related to (1) the alleged vagueness of Rule 1 of his supervised release conditions; (2) the alleged inadequate notice of the alcohol violation; and (3) the circuit court's alleged improper reliance on uncharged halfway house rules violations. We address each of his arguments in turn.

¶ 51. First, Burris asserts that Rule 1 of his supervised release, which states, "[y]ou shall avoid all conduct that is a violation of federal or state statute, municipal or county ordinances or that is not in the best interest of the public's welfare or your rehabilitation," is unconstitutionally vague. Burris argues that Rule 1 is vague and all encompassing, that "any ordinary human" would have a few minor rule violations, and that the rule provides "little in the way of guidance but a lot in the way of snares." Burris concludes that he was "set up to fail."

¶ 52. The court of appeals declined to address the breadth of the rule because "[Burris's] behavior so plainly falls within the language of the rule." The court reasoned that, in light of Burris's history of serious sex offenses, "an ordinary person would have been cognizant that obtaining a prescription for a sexual-performance-enhancing drug would not be in the public's or in Burris's best interest." *Burris,* 258 Wis. 2d 454, ¶ 6.

¶ 53. Like a probation condition, a rule regulating the conduct of a sexually violent person on supervised release satisfies the procedural due process requirement of adequate notice if it is sufficiently precise for

the probationer to know what conduct is required or prohibited. *State v. Lo,* 228 Wis. 2d 531, 535, 599 N.W.2d 659 (Ct. App. 1999). In the context of criminal statutes, we have stated that "when the alleged conduct of a defendant plainly falls in the prohibited zone, the defendant may not base a constitutional vagueness challenge on hypothetical facts." *State v. Pittman,* 174 Wis. 2d 255, 277, 496 N.W.2d 74 (1993) (citing *State v. Courtney,* 74 Wis. 2d 705, 713, 247 N.W.2d 714 (1976)). We find the logic of this principle to apply with equal force in a challenge to the rules and conditions of supervised release under Wis. Stat. ch. 980.

¶ 54. Burris does not allege that he was unaware that his actions were prohibited. Judge Welker found that it was Burris's deceptive actions, and not the Viagra prescription per se, that violated Rule 1. Burris obtained the prescription without discussing the matter with his supervising agent or anyone else in authority. He became angry when he found out that his courier—a woman he had been warned not to contact—gave the prescription to a halfway house staff member instead of to him. When the staff member attempted to pass the prescription on, he refused to accept it. After the incident, he refused to discuss the matter and refused to cooperate with his supervising agent.

¶ 55. It was clear to the court of appeals that a reasonable person would know that a sexually violent person in the custody of DHFS should avoid surreptitiously obtaining a prescription for a drug designed to enhance one's ability to have sexual intercourse. Although Burris asserts that "it is difficult to see why the court [of appeals] believed Burris'[s] conduct so plainly violated Rule 1," Judge Welker's factual findings indicate that Burris himself realized the impropriety of obtaining the Viagra prescription. His secretive actions

before and during the incident, as well as his uncooperative reaction when his actions were discovered, show that he knew his conduct was not permitted.

¶ 56. We agree with the court of appeals that Burris's conduct fell squarely within the prohibited zone of Rule 1. Burris cannot complain that Rule 1 is vague by arguing that he did not know what was prohibited because his own actions and reactions point to a contrary conclusion. Burris is therefore prohibited from challenging the rule on vagueness grounds because he himself was aware that, as a sexually violent person, his secretive conduct regarding his sex life was conduct not in the best interest of the public welfare or his rehabilitation.

■■

¶ 57. Second, Burris asserts that he did not receive the second amended complaint that contained the alcohol violation until the day before his revocation hearing. This contention is not supported by the record. Burris filed a motion on January 7, 2000, stating: "On December 30, 1999, the Department filed a Second Amended Statement of Probable Cause for Detention and Petition for Revocation of Supervised Release," asserting the alcohol violation. There was no allegation in that motion that the amended complaint had not been timely received. On January 8, 2000, during the revocation hearing, Burris's attorney stated: "I think it was December 30th that the department filed another amended statement of probable cause and the second or third event of statement of probable cause is the one alleging that Mr. Burris consumed alcoholic beverages while at Rock Valley." At a hearing on January 9, 2001, Burris's appellate attorney grilled Burris's trial attorney:

Q Okay. Now, at the time that you drafted Attach-
ment C [dated January 3, 2000], were you aware
of the allegation that Ervin Burris had been
drinking on the grounds of the halfway house?

A I don't think so. Or, wait, well, let me just see
here. Well, I'm not sure, to tell you the truth. I'm
looking at — part of my file indicates that the
drinking allegation was received on December
30th, so it's possible that I was aware.

¶ 58. We find the claim that Burris did not receive
notice until the day prior to the hearing has no factual
basis. He received notice nine days before the hearing
and he fails to specify how that notice prevented him
from mounting a defense. *Burris,* 258 Wis. 2d 454,
¶ 13.

¶ 59. Third, Burris contends that he did not re-
ceive notice that the State intended to introduce evi-
dence that he violated the rules of the halfway house
and that the circuit court erroneously relied on this
information. In his brief, Burris argues that the court of
appeals "failed to come to terms with how the circuit
court made much to do over Burris'[s] alleged violations
of the half-way house rules, and how these violations
supposedly proved that neither Burris nor anyone else
could be adequately supervised by the half-way house.
In that Burris'[s] alleged violations of the half-way
house rules appeared to go to the crux of the circuit
court's determinations, the 'harmless error' analysis
was cursory and erroneously utilized by the court of
appeals."

¶ 60. Burris offers mere conclusions that the
court of appeals did not realize the extent to which the
circuit court relied on the halfway house rules and that

its harmless error analysis was "cursory and erroneous." However, Burris has not referenced the record as to how the circuit court "made much to do" of the halfway house violations, nor has he pointed to any flaw in the court of appeals harmless error analysis.

¶ 61. As the court of appeals noted, the State introduced evidence that Burris violated the halfway house rules in order to prove the allegations contained in its revocation petition. *Burris,* 258 Wis. 2d 454, ¶ 14. For instance, the State introduced evidence that Burris deviated from the conditions of a pass he received when he went to a motel to have sex with a married woman. Whether Burris violated halfway house rules by violating the terms of the pass is only incidental to the more critical fact that Burris used the pass for an unauthorized sexual liaison. In another instance, the State presented evidence that Burris had been found in the parking lot of the halfway house with alcohol. The court of appeals indicated that this demonstrated that the "halfway house staff could not always monitor whether Burris had been drinking or been having unauthorized intimate relations." *Id.*

¶ 62. While Burris may be correct that conduct violating the rules of the halfway house was at the heart of the reasons for revocation, Judge Welker relied upon Burris's conduct itself, not the halfway house rules, to make his decision to revoke. The rules of a regulated community placement facility are likely to overlap the rules and conditions of supervised release. It was a minor indiscretion at most for the State to present evidence, without prior notice, that conduct charged in the revocation petition violated two sets of rules instead of only one.

¶ 63. Burris states no legal reason why he believes the court of appeals harmless error analysis was "cur-

sory and erroneous." Although the court of appeals, in the interest of being thorough, undertook a harmless error analysis to support its determination, the harmless error analysis was not the sole basis for its rejection of Burris's claim. The court of appeals indicated that even if the circuit court used the halfway house rules in its decision, that reliance would not have mattered. Burris does not allege that the court of appeals used an improper legal standard, or misapplied that legal standard. We see no reason to disturb the court of appeals harmless error analysis inasmuch as it was not vital to the court of appeals' holding.

## D. Sufficiency of the Evidence

¶ 64. Finally, Burris alleges that the underlying evidence does not support the circuit court's finding that the safety of others required revocation. He states, "the circuit court, when rendering its decision, outside of its arbitrary and capricious conclusion that Mr. Burris needed to be committed to a secure facility for the safety of the public, likewise made no real attempt to explain how Mr. Burris'[s] minor rule violations justified any conclusion that he had become a higher risk to re-offend than he was when placed initially on supervised release." Burris goes on to allege that "the circuit court deemed Mr. Burris a danger to the public safety primarily, if not exclusively, due to Mr. Burris'[s] past behaviors that resulted in his criminal convictions. In other words, once a sexual offender, always a sexual offender." At base, Burris asserts that the only reason Judge Welker found that the safety of others required revocation of supervised release was Burris's past criminal convictions, and therefore his revocation of supervised release was punishment for Burris's previous crimes. We do not agree.

328

¶ 65. Before we address the merits of Burris's claim, we must address again the standard of review. In most instances, the decision to revoke supervised release is a discretionary decision. *See* ¶ 45 above. When a judge makes a determination that the safety of others *requires* that supervised release be revoked, however, the plain language of § 980.06(2)(d) does not afford the decision-maker discretion in the same way that a court or administrative body exercises discretion in the context of probation.

¶ 66. "The question of judicial authority is a question of law that we review de novo." *City of Sun Prairie v. Davis,* 226 Wis. 2d 738, 747, 595 N.W.2d 635 (1999) (citing *In Interest of E.C.,* 130 Wis. 2d 376, 381, 387 N.W.2d 72 (1986)). Likewise, the interpretation of a statute is a question of law that we review de novo while benefiting from the analysis of the court of appeals and the circuit court. *Smith v. General Casualty Insurance Co.,* 2000 WI 127, ¶ 7, 239 Wis. 2d 646, 619 N.W.2d 882.

¶ 67. The relevant language of Wis. Stat. § 980.06(2)(d) is as follows:

> The state has the burden of proving by clear and convincing evidence that any rule or condition of release has been violated, or that the safety of others requires that supervised release be revoked. If the court determines after hearing that any rule or condition of release has been violated, or that the safety of others requires that supervised release be revoked, it may revoke the order for supervised release and order that the released person be placed in an appropriate institution.

Wis. Stat. § 980.06(2)(d).

¶ 68. As we have previously stated, there are two predicate circumstances that might persuade a circuit court to revoke supervised release: a finding that a "rule or condition of release has been violated" or a finding that "the safety of others requires that supervised release be revoked." Wis. Stat. § 980.06(2)(d). Because Judge Welker relied on the second of these predicate circumstances when he concluded that "the safety of others requires his commitment to a secure facility,"[12] we focus our analysis on the process dictated by this standard.

¶ 69. In *Morrissey*, the Supreme Court envisioned a revocation decision with two discrete steps. First, the decision-maker must establish the underlying facts that constitute the basis for revocation. Second, the decision-maker must properly exercise discretion and decide whether or not underlying circumstances warrant revocation. The Court described the process as follows:

> The first step in a revocation decision . . . involves a wholly factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation? The first step is relatively

---

[12] We note that nothing in § 980.06(2)(d) purports to limit a court that finds rules violations to rely upon only the first predicate as the ground for revocation. If a court finds that one or more rule violations demonstrate by clear and convincing evidence that the safety of others requires revocation, it may revoke under the second predicate condition. Thus, it was proper for Judge Welker to reach a conclusion that the safety of others required revocation based on findings that Burris had violated several rules of his supervised release.

simple; the second is more complex. The second question involves the application of expertise by the parole authority in making a prediction as to the ability of the individual to live in society without committing antisocial acts. This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were. Yet this second step, deciding what to do about the violation once it is identified, is not purely factual but also predictive and discretionary.

*Morrissey,* 408 U.S. at 479–80.

¶ 70. Our legislature set forth a somewhat different test for revocation under § 980.06(2)(d) when the revocation is based on the "safety of others" clause. This test departs from the Court's discussion of a two-part revocation decision. When a court revokes under the "safety of others" rationale, the court is charged with making a much more specific finding than a court does when it is determining whether a rule or condition of release has been violated. While the court must first find underlying evidentiary facts as contemplated by *Morrissey,* the court must also find by clear and convincing evidence that these underlying facts demonstrate that "the safety of others requires that supervised release be revoked." Only after this ground has been proved by the state and determined by the court is the court given authority to revoke supervised release. The second step described by *Morrissey* as factual, predictive, and discretionary is no longer discretionary when the court makes the determination on "safety of others."

¶ 71. Thus, we view the finding that the safety of others requires revocation as a mixed question of fact and law because the circuit court is vested with no discretionary power. Instead, the statute directs the circuit court to apply its factual finding to a statutory standard. *See Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983) ("Whether the facts fulfill the legal standard . . . is a determination of law."). When determining whether the safety of others requires that supervised release be revoked, the circuit court first evaluates the evidence presented at the revocation hearing and renders factual findings. We uphold these factual findings unless clearly erroneous. *State v. Martwick,* 2000 WI 5, ¶ 18, 231 Wis. 2d 801, 604 N.W.2d 552. The circuit court then determines whether the facts as found meet the particular legal standard set forth by the statute. Whether the facts ascertained by the circuit court prove by clear and convincing evidence that "the safety of others requires that supervised release be revoked" is a question of law. Normally, an appellate court reviewing determinations of law does so without deference to the circuit court. *Wassenaar,* 111 Wis. 2d at 525. Because the factual findings on "safety of others" under § 980.06(2)(d) are so closely intertwined with the court's determination that, as a matter of law, the safety of others requires that supervised release be revoked, a reviewing court "should give weight to the trial court's decision, although the trial court's decision is not controlling." *Id.*

¶ 72. Burris does not allege that Judge Welker's factual findings are clearly erroneous, and therefore we will assume that the evidence supports his findings. Instead, Burris challenges Judge Welker's conclusion

based on the findings that the evidence did not indicate that Burris was a high risk to commit violent acts against others. He reasons that his conduct was not dangerous in and of itself, and therefore it is impossible to infer from that conduct that he presented a danger to others. We disagree. Contrary to Burris's claim, one need not threaten violent acts, as in *State v. Jefferson,* 163 Wis. 2d 332, 336, 471 N.W.2d 274 (Ct. App. 1991), for a court to find that an individual presents a danger to others. A court is not forced to wait until overtly dangerous acts have been committed; it is not required to ignore indications that a sexually violent person has disregarded the rules repeatedly in the past and will do so in the future. If the court finds that the state has proven by clear and convincing evidence that the safety of others requires revocation, the statute authorizes the circuit court to revoke supervised release.

¶ 73. Judge Welker found that Burris disregarded the rules of his supervised release in order to satisfy his compulsive urges. Burris consumed alcohol, a drug that lowers inhibitions. He abused the privileges provided to him in order to meet a married woman and have sex with her, in derogation not only of the rules and conditions of his supervised release but also in direct contradiction of his supervising agent's warning not to contact the woman. Without the permission of his supervising agent, Burris secretly sought out a drug designed to enhance his sex life. Upon discovery of this secret, Burris became angry and refused to accept the prescription, demonstrating that he knew his conduct was improper.

¶ 74. The court concluded that these repeated violations of the rules of his supervised release involving sex and alcohol demonstrated that written rules and

conditions and verbal admonitions were inadequate to protect the public. While these major transgressions did not specifically injure others through violence, they demonstrated that Burris was unable to conform his conduct to the rules and conditions of supervised release when he sought to satisfy his physical urges. In addition, Burris was not meaningfully participating in his sex offender treatment. Hence, Burris had become a clear risk to the community. The court determined there was no option short of revocation that would ameliorate the risk to the community because the serious nature of written rules, the verbal warnings, and the importance of treatment were lost on Burris. We conclude that the evidence supports Judge Welker's conclusion that the safety of others required that his supervised release be revoked.

## CONCLUSION

¶ 75. In conclusion, we affirm the decision of the court of appeals. As a general rule, sexually violent persons on supervised release under Chapter 980 are not entitled to a due process right to have the circuit court consider and reject alternatives to revocation before revoking supervised release. This is especially true when the court determines that the safety of others requires that supervised release be revoked. We also conclude that there was no constitutional "unfairness" in Burris's revocation proceedings, and hold that the evidence supports the circuit court's conclusion that revoking Burris's supervised release was required for the safety of others.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 76. N. PATRICK CROOKS, J. *(concurring)*. The majority concludes that in a situation where the basis

for the revocation of a sexually violent person's supervised release is violation of one or more conditions or rules, "a court should explore alternatives or fully explain why some step short of revocation would not be adequate." Majority op., ¶ 44. However, I believe that the language used by the majority does not go far enough. Therefore, I conclude that, in a situation where the basis for the revocation of a sexually violent person's supervised release is a rules violation, rather than a determination based on public safety, a court *must* consider alternatives to revocation on the record. Such consideration is required as a matter of good policy, as outlined in *State ex rel. Plotkin v. Department of Health & Social Services,* 63 Wis. 2d 535, 217 N.W.2d 641 (1974), and *Van Ermen v. Department of Health & Social Services,* 84 Wis. 2d 57, 267 N.W.2d 17 (1978), and because an appropriate application of Wis. Stat. § 980.06(2)(b) calls for it.

¶ 77. In *Plotkin,* we found that alternatives to revocation should be considered prior to the revocation of probation, and adopted Section 5.1 of the American Bar Association's *Standards Relating to Probation* as guidelines for Wisconsin courts to follow in such situations. *Plotkin,* 63 Wis. 2d at 544–45. *See also* majority op., ¶ 29. In *Van Ermen,* this court reached a similar conclusion, but with regard to the revocation of parole. *Van Ermen,* 84 Wis. 2d at 66. These two decisions are applicable to this case, because, as the majority notes, allegedly sexually violent persons have the same constitutional rights as criminal defendants at trial, and the procedural due process protections of "probation and parole revocation proceedings also apply in supervised release revocation proceedings under Chapter 980." Majority op., ¶ 22. *See also State v. VanBronkhorst,* 2001 WI App 190, ¶ 9, 247 Wis. 2d 247, 633 N.W.2d 236.

Using Section 5.1, *Plotkin* outlines several alternatives that " 'should be considered in every case as possible alternatives to revocation.' " *Plotkin,* 63 Wis. 2d at 545 (citation omitted). *Van Ermen* stated that discretion should be exercised "by at least considering whether alternatives are available and feasible." *Van Ermen,* 84 Wis. 2d at 67. Thus, requiring consideration of alternatives to revocation of a sexually violent person's supervised release in situations where the basis for the revocation is the violation of the conditions or rules of release is necessary in order to comply with prior decisions of this court and the court of appeals.

¶ 78. The language of Chapter 980 states that "[t]he department shall arrange for control, care and treatment of the person in the least restrictive manner consistent with the requirements of the person . . . ." Wis. Stat. § 980.06(2)(b). The language of § 980.06(2)(b) ties the statute to this court's decisions in *Plotkin* and *Van Ermen.* To comply with § 980.06(2)(b), the least restrictive manner for control, care and treatment of a sexually violent individual must be utilized. In order to determine the least restrictive manner, it follows that alternatives to revocation must be considered and such consideration must be on the record for purposes of review.

¶ 79. While I concur for the reasons noted, I join the majority in affirming the court of appeals' decision, since here the circuit court based its revocation order on the need to protect the safety of others. *See* majority op., ¶ 14.

¶ 80. For the foregoing reasons, I respectfully concur.

¶ 81. I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence.

¶ 82. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). The majority summarily and without analysis concludes that "the proceedings in this matter were neither arbitrary nor fundamentally unfair."[1] I conclude that the minimum due process requirement of notice was violated in the present case.

¶ 83. Furthermore, the majority upholds the circuit court's decision to revoke supervised release on the ground that revocation of supervised release is necessary for the safety of others. I conclude that the State failed to prove this ground for revocation by clear and convincing evidence.

¶ 84. Finally, I reach the question of whether a circuit court must consider alternatives to revocation. As to rules violations cases—I agree with Justice Crooks' concurrence that alternatives to revocation must be considered before a circuit court exercises its discretion to revoke supervised release in cases of rules violations. Alternatives to revocation must be considered after a circuit court finds that rules have been violated and a circuit court is exercising its discretion about revocation. Unfortunately, the majority opinion is fuzzy on this point.[2]

¶ 85. I also conclude that alternatives to revocation must be considered when the State and circuit

---

[1] Majority op., ¶ 2. *See also id.*, ¶ 75.

[2] The majority opinion states that a circuit court "should explore alternatives or fully explain why some step short of revocation would not be adequate." Majority op., ¶ 44. At another point the majority opinion states, "When supervised release is revoked on the basis of the violation of a rule or condition of release, the court should explain its decision and square that decision with the treatment-oriented purposes of the law." Majority op., ¶ 45. In ordinary usage and dictionary definition the word "should" means "is obliged to" or "has a duty

court are resting on the second ground of revocation, that is, that the safety of others requires revocation. Inherent in a determination that the safety of others requires revocation is the determination that alternatives to revocation will not protect the safety of others.[3] After a circuit court has considered the evidence and alternatives to revocation, the circuit court decides whether the safety of others requires revocation. If the

to." Justice Crooks, however, does not read the word "should" as used in the majority opinion to mean "must." *See* Justice Crooks's concurrence, ¶ 1.

Rather than force litigants and courts to guess at the meaning of the majority opinion's dicta regarding consideration of alternatives to revocation in rules violations cases, the majority opinion should state clearly that alternatives must be considered in rules violations cases or that alternatives need not be considered in rules violations cases but that such consideration of alternatives is good practice, or that it is not addressing the issue of alternatives in rules violations case because this case involves the second ground, public safety.

The majority opinion's concluding paragraph appears to decide the due process issue for both grounds for revocation, stating broadly as follows: "As a general rule, sexually violent persons on supervised release under Chapter 980 are not entitled to a due process right to have the circuit court consider and reject alternatives to revocation before revoking supervised release." Majority op., ¶ 75. The majority opinion does not explain why this proposition is stated with the weasel words "as a general rule" and does not provide any hints about the exceptions to this general rule.

[3] The majority opinion makes this point clearly as follows: "We think it is self-evident, however, that when the court determines, on the evidence after a hearing, that 'the safety of others requires that supervised release be revoked,' the court has found that there is clear and convincing evidence that it has no alternative but to revoke to assure the safety of others." Majority op., ¶ 40.

circuit court decides that the safety of others requires revocation, revocation is mandated by the statute.

## I

¶ 86. I agree with the majority opinion that procedural due process protections apply in supervised release revocation proceedings under chapter 980.[4] As the majority opinion acknowledges, due process requires at a minimum written notice of the claimed violations and disclosure of the evidence against the person.[5] "There is no principle of due process more important or firmly established than notice of the specific charge so that the accused can make a defense."[6] These basic procedural due process protections were not afforded Burris.

¶ 87. Wisconsin Stat. § 980.06(2)(b) (1997–98)[7] is unequivocal in requiring that the State prove by clear and convincing evidence *either* that the rules or conditions of release had been violated *or* that the safety of others requires revocation.[8]

¶ 88. The majority opinion explicitly recognizes the distinction between the two "predicates" of revocation, going so far as to declare that a circuit court has discretion to revoke if the first ground is charged (the statutory word "may" means "may") but is required to

---

[4] Majority op., ¶ 22.

[5] *Id.,* ¶ 24.

[6] *In re Commitment of VanBronkhorst,* 2001 WI App 190, ¶ 15, 247 Wis. 2d 247, 633 N.W.2d 236 (citing *Cole v. Arkansas,* 333 U.S. 196, 201 (1948)).

[7] This statute has been renumbered Wis. Stat. § 980.08(6m) (2001–02).

[8] Majority op., ¶ 68.

revoke if the second ground is charged (the statutory word "may" means "shall").[9]

¶ 89. Due process requires the State to notify Burris under which ground (or grounds) it is proceeding so Burris may defend himself. Furthermore, Burris and the circuit court must know under which ground (or grounds) the State is proceeding because each must know whether revocation is discretionary or mandatory with the circuit court.

¶ 90. Burris had a list of 57 rules or conditions to follow. The State filed a petition (and two amendments thereto) alleging five violations[10] of four rules or conditions.[11] Two violations were charged only as violations

---

[9] Majority op., ¶¶ 46, 49.

[10] The State alleged the following violations:

1. Burris obtained Viagra in violation of Rule 1.

2. Burris did not sign a confidentiality release form for an agent to contact his physician in violation of Rule 1.

3. Burris refused to provide his agent with a written statement in violation of Rules 1, 4 and 13.

4. Burris involved himself in an intimate relationship and failed to notify his agent in violation of Rules 1, 4, and 18.

5. Burris possessed and consumed alcoholic beverages and offered them to another in violation of Rules 1 and 15a.

[11] The four rules Burris is alleged to have violated are as follows:

Rule 1: You shall avoid all conduct that is a violation of federal or state statute, municipal or county ordinances or that is not in the best interest of the public's welfare or your rehabilitation.

Rule 4: You shall inform your agent of your whereabouts and activities as she/he directs.

Rule 13: You shall provide true and correct information orally and in writing in response to inquiries by the agent.

of the catch-all provision of Rule 1 that states that Burris shall avoid all conduct "that is not in the best interest of the public's welfare or your rehabilitation." Each of the other alleged violations was charged as a violation of the catch-all provision of Rule 1, as well as another rule. Burris asserts Rule 1 is unconstitutionally vague. Constitutional or not, I believe a circuit court should treat an allegation of a breach of this catch-all Rule 1 with a healthy dose of skepticism. Any conduct of which the State does not approve falls within Rule 1, making it almost impossible for Burris to know how to conform his conduct to comply with the rules.

¶ 91. The State has the burden of proving by clear and convincing evidence that a rule or condition has been violated. Wis. Stat. § 980.06(2)(b). The parties disputed each alleged rule violation. The circuit court lumped the alleged violations together as demonstrating a "course of deceitful conduct," making Burris dangerous, but did not necessarily make findings regarding whether Burris had violated each rule. The majority opinion engages in serious overstatement when it characterizes the record as demonstrating that Burris engaged in "major transgressions."[12] Hardly![13]

---

Rule 15: The specific rules imposed at this time are:

> A. You shall not consume or possess alcohol, illegal drugs or drug paraphernalia.

Rule 18: You shall notify your agent of any involvement in an intimate relationship at its beginning and you shall introduce the person to your agent to disclose your past sexual offenses prior to engaging in any type of sexual activity with that person.

[12] Majority op., ¶ 74.

[13] For example, the circuit court never found that Burris's conduct relating to Viagra was a rule violation. Rather the circuit court found that Burris thought his conduct was a rule

¶ 92. After all the testimony was presented regarding the rules violations (testimony was not offered relating to Burris's jeopardizing the safety of others), the circuit court asked the assistant district attorney whether the court was limited to determining whether there was a rule violation or whether it could base its revocation decision on the second ground that public safety required revocation. The assistant district attorney advised the circuit court to rule on either ground as it saw fit. Defense counsel argued that the State had to prove by clear and convincing evidence that the rules violations occurred.

violation. By the way, Burris never obtained any Viagra, nor did he ever obtain the prescription. A prescription slip for the Viagra was delivered to the halfway house, and the director of the house authorized another staff member to deliver the slip to Burris, who refused it.

No rule required Burris to voluntarily release confidential medical information.

The violation repeatedly stated by the circuit court was Burris's failure to tell his agent. For example, the circuit court said that Burris did not advise his agent of an "intimate relation." The circuit court did not determine whether a consensual adult one-night sexual encounter was an intimate relationship. Indeed the circuit court declared that Burris would benefit from a normal sexual relationship with an adult woman. The circuit court stated that sex with a married woman violated the criminal adultery statute but then conceded that no one is prosecuted for adultery.

Although there was testimony that Burris was seen drinking, there was also evidence that Burris had been given several random urine and breathalyzer tests; none showed any sign of alcoholic beverage consumption.

¶ 93. The circuit court did not make express findings regarding each allegation of rules violations, as required.[14] The circuit court and the majority opinion improperly conflate the two grounds (referred to as "predicates" in the majority opinion) for revocation of supervised release: rules violations and public safety. The two are, however, related. For example, a circuit court may find rule violations and conclude that these violations demonstrate that the safety of others requires that it exercise its discretion to revoke supervised release.[15] In the present case, however, the circuit court did not so proceed. The circuit court "relied upon Burris's conduct itself, not the halfway house rules" in deciding to revoke.[16]

¶ 94. When the State relies on allegations of rules violations, the second step the circuit court must take after determining whether any rule was violated is to determine whether the rules violations justify revocation of supervised release or whether some measures short of revocation satisfy rehabilitation and safety considerations.[17]

¶ 95. Violation of a rule may be a permissible basis for revocation, but revocation does not necessarily or automatically follow the establishment of a violation.[18] The circuit court did not, in this rules violation case, "explore alternatives or fully explain why some step short of revocation would not be adequate."[19] The circuit court did not "explain its decision and square

---

[14] Majority op., ¶ 10.

[15] *Id.,* ¶ 68 n.12.

[16] *Id.,* ¶ 62.

[17] *Id.,* ¶ 69.

[18] *Id.,* ¶¶ 38, 69.

[19] *Id.,* ¶ 44.

that decision with the treatment-oriented purposes of the law," including the purpose of controlling sexually violent persons " 'in the least restrictive manner consistent with the requirements of the person.' Wis. Stat. § 980.06(2)(b)."[20]

¶ 96. Instead the circuit court ignored the alleged rules violations and ruled on the second ground, safety of others. It reached this conclusion upon finding that "Mr. Burris has engaged in a deceitful course of conduct with his agent," that the facility in which Burris was placed "is not a proper facility for any person who is committed under a 980 placement," and that "his history makes him an extreme risk for harm to the public if there is not significantly more control exercised over his activities than have [sic] been exercised in the past." Although Burris' history is an important consideration, the issue at this revocation hearing in which rules violations were alleged is whether the rules violations justified the conclusion that Burris should be returned to institutional care because he had become a higher risk to re-offend than when he was initially placed on supervised release.

¶ 97. Burris came to court to defend against allegations that he violated the rules of his supervised release with the expectation that the circuit court could exercise its discretion to revoke supervised release. The circuit court concluded that Burris's placement in the half-way house in which he was placed was not suitable for *any* chapter 980 person, but it made no attempt to explore whether any other supervised release placement was suitable for Burris, considering both public safety and rehabilitation. Burris left court with the circuit court having found that public safety requires

---

[20] *Id.*, ¶ 45.

revocation of his supervised release and that revocation was, according to the majority opinion, mandated by statute.

¶ 98. Thus Burris received notice that the State was proceeding on the basis of one ground for revocation of supervised release but was tried on the second ground for revocation of supervised release. Yet Burris had no notice of the change of charges and had no opportunity to defend. This failure to give Burris notice cannot be characterized as "a minor indiscretion" on the part of the State, as the majority opinion characterizes other problems in the record.[21]

¶ 99. Due process requires, at a minimum, written notice of the claimed violation and disclosure of the evidence against the person. Burris received neither in regard to the claim that he was jeopardizing the safety of others. The circuit court never made clear whether its ruling was a discretionary one or not, yet the majority opinion concludes that the circuit could not have exercised discretion. Nor can this court exercise the circuit court's discretion on review; the record is not sufficient.

¶ 100. The core of the process due Burris, the opportunity for a meaningful hearing on the alleged violation and the appropriate disposition, was not available to him. The proceedings were arbitrary and fundamentally unfair.

---

[21] *Id.,* ¶ 62.

## II

¶ 101. The majority opinion concludes that supervised release must be revoked upon a circuit court's finding that the safety of others requires revocation of supervised release.[22] That makes sense!

¶ 102. The majority opinion fails, however, to explain how the State by clear and convincing evidence proved that the safety of others required revocation of Burris's supervised release. The State offered no proof of how or why Burris's conduct justified the conclusion that he had become a higher risk to re-offend than he was when initially placed on supervised release.

¶ 103. Wisconsin Stat. § 980.06(2)(b) does not explicitly articulate what a circuit court must consider in determining whether public safety requires a chapter 980 person to be institutionalized.[23] I think it self-evident that to succeed in its petition for revocation of supervised release on the ground that public safety requires revocation, the State must make substantially the same proof as the statutes require the State to make when the State opposes a petition for supervised release. In opposing such a petition, the State must prove by clear and convincing evidence that the person is still a sexually violent person and that it is substantially probable that the person will engage in acts of sexual violence if the person is not committed to institutional care.[24]

¶ 104. Inherent in a determination that the safety of others requires revocation is the determination that alternatives to revocation will not protect the safety of

---

[22] *Id.,* ¶¶ 71–74.

[23] *See id.,* ¶ 40.

[24] *See* Wis. Stat. § 980.08(4).

others. The majority opinion states this principle clearly: "We think it is self-evident, however, that when the court determines, on the evidence after a hearing, that 'the safety of others requires that supervised release be revoked,' the court has found that there is clear and convincing evidence that it has no alternative but to revoke to assure the safety of others. Put another way, the court has found that the safety of others requires the person's commitment to a secure facility because supervised release will not be adequate."[25]

¶ 105. It is only after a circuit court has considered the evidence relating to the chapter 980 individual's conduct and alternatives to revocation that the circuit court can decide that the safety of others requires revocation. If the circuit court decides that the safety of others requires revocation, then revocation is, of course, mandated by the statute.

¶ 106. The State did not prove by clear and convincing evidence that Burris was still a sexually violent person and that it was substantially probable that he would engage in acts of sexual violence unless he was committed to institutional care. The circuit court's proclamation that Burris's conduct demonstrated that Burris suffered from "compulsive personality" and therefore public safety required revocation is unsupported in the record. A "course of deceitful conduct," as found by the circuit court, may not be desirable behavior from a chapter 980 individual, but it is certainly not clear and convincing proof that Burris is still a sexually violent person and that it is substantially probable that he will engage in acts of sexual violence if he is not

---

[25] Majority op., ¶ 40. *See also* part III of this dissenting opinion.

committed to institutional care. The State failed to offer any proof that no alternative to revocation would be sufficient to protect the public safety. Indeed the circuit court did not consider any alternative placements, even though the circuit court determined that the placement in this half-way house was unsuitable for all chapter 980 individuals.

### III

¶ 107. Wisconsin Stat. § 908.06(2)(b) mandates that a circuit court must consider alternatives to revocation of supervised release in both grounds for revocation of supervised release.

¶ 108. As to rules violations cases—I agree with Justice Crooks' concurrence that alternatives to revocation must be considered before a circuit court exercises its discretion to revoke supervised release in cases of rules violations. Revocation of a particular supervised release may be appropriate but another type of supervised release may also be appropriate considering the changing circumstances of the person and the needs of public safety.[26]

¶ 109. As to the safety-of-others cases— alternatives to revocation must be considered before a court can make the predicate determination that the safety of others requires revocation. A finding that public safety requires revocation by definition requires a finding that supervised release is inappropriate. If a circuit court fails to consider whether the safety of others can be protected by some form of supervised

---

[26] *See* majority op., ¶ 38.

release, a circuit court's ruling that revocation is required to protect the safety of others is not supported by the record.[27]

¶ 110. The record in the present case demonstrates that the real basis for the circuit court's decision to revoke supervised release was that placement in this half-way house was not suitable for any chapter 980 committee. The clear inference from the record is that a different placement might have been satisfactory for Burris and for public safety. But, as the circuit court was well aware, the State has had great difficulty in finding or establishing placements for chapter 980 individuals.[28]

¶ 111. Furthermore, the legislative policy underlying chapter 980 requires a circuit court to consider alternatives to revocation.

¶ 112. "[T]he constitutionality of a Chapter 980 commitment hinges on treatment,"[29] and the state must focus on appropriate treatment for chapter 980 individuals as well as protecting the public. Without such a focus, our repeated exhortations that chapter 980 is constitutional as a "treatment-oriented statute"[30] are meaningless.

¶ 113. Chapter 980 individuals are committed to the Department of Health and Family Services "for

[27] *See* ¶¶ 104–106, *supra.*

[28] *See, e.g.,* majority op., ¶ 5 n.5; *State v. Morford,* 2004 WI 5, 268 Wis. 2d 300, 674 N.W.2d 349; *State v. Keding,* 2002 WI 86, 254 Wis. 2d 334, 646 N.W.2d 375; *State v. Rachel,* 2002 WI 81, 254 Wis. 2d 215, 647 N.W.2d 762 (Bradley, J., concurring); *State v. Schulpius,* 2004 WI App 39, ¶ 9, 270 Wis. 2d 427, 678 N.W.2d 369.

[29] *State ex rel. Marberry v. Macht,* 2003 WI 79, ¶ 38, 262 Wis. 2d 720, 665 N.W.2d 155 (Bradley, J., concurring).

[30] Majority op., ¶ 35.

control, care and treatment"[31] in the "least restrictive manner consistent with the requirements of the person and in accordance with the court's commitment order."[32] As Justice Crooks correctly points out, "to determine the least restrictive manner, it follows that alternatives to revocation must be considered and such consideration must be on the record for purposes of review."[33]

¶ 114. Chapter 980 individuals are not prisoners, but patients of the state.[34] As such, they are entitled to the same rights as patients under chapter 51, the Mental Health Act, including the right to "receive prompt and adequate treatment, rehabilitation and educational services appropriate for [their] condition."[35]

¶ 115. The crux of chapter 980 is that commitment is not punishment but a measure for the protection of community and the treatment of chapter 980 individuals.[36] Unless both of these objectives are given weight in dealing with chapter 980 individuals, the state is doing nothing more than indefinitely warehousing chapter 980 individuals.

---

[31] *See* Wis. Stat. § 980.0(1).

[32] *See* Wis. Stat. § 980.06(2)(b).

[33] Concurring op., ¶ 3.

[34] *State v. Post,* 197 Wis. 2d 279, 313, 541 N.W.2d 115, 126 (1995).

[35] Wis. Stat. § 51.61(1)(f); *Post,* 197 Wis. 2d at 313–14. Patients are entitled to facilities that are "designed to make a positive contribution to the effective attainment of the treatment goals of the hospital." Wis. Stat. § 51.61(1)(m); *Post,* 197 Wis. 2d at 314.

[36] *Post,* 197 Wis. 2d at 313.

¶ 116. In considering the needs of public safety and the treatment needs of the chapter 980 individual, a circuit court must, under chapter 980, consider alternatives to revocation before revoking a particular supervised release under either grounds for revocation.

¶ 117. For the reasons set forth, I dissent.