STATE EX REL. PLOTKIN, Appellant, V. DEPARTMENT OF HEALTH & SOCIAL SERVICES, and others, Respondents.

*No. 507. Argued April 1, 1974.—Decided May 20, 1974.*
(Also reported in 217 N. W. 2d 641.)

536

538

For the appellant there was a brief by *Shellow &
Shellow* and *Stephen M. Glynn,* all of Milwaukee, and oral
argument by *Mr. Glynn.*

For the respondents the cause was argued by *Robert
D. Repasky,* assistant attorney general, with whom on
the brief was *Robert W. Warren,* attorney general.

HEFFERNAN, J. The only question before the court is
whether the Department of Health & Social Services
abused its discretion in revoking Plotkin's probation. On
this appeal Plotkin acknowledges that he was afforded
full substantive and procedural due process in respect
to the notices and hearings that led up to the revocation
of his probation. A claim that he was denied due process
because he was not given an opportunity to respond to a
separate memorandum of the bureau of probation and
parole to the secretary subsequent to the hearing has been
specifically abandoned on this appeal.

It is Plotkin's contention that a revocation of probation
can be made only where the administrative officer has
specifically found that the defendant was not a "good
risk" for continued probation. He predicates this argu-
ment basically upon the language of the Wisconsin statute
which confers the power of revocation on the Department

of Health & Social Services under certain circumstances. That statute, sec. 973.10 (2), provides:

"If a probationer violates the conditions of his probation, the department may order him brought before the court for sentence which shall then be imposed without further stay or if he has already been sentenced, may order him to prison; and the term of the sentence shall begin on the date he enters the prison."

Plotkin argues that by the use of the word, "may," the legislature clearly indicated its intention that the decisions to order a probation hearing or to order a revocation of the probation after a hearing were to be discretionary acts—that revocation does not follow of course a finding that a condition of probation has been violated. That position is correct. The discretion whether to hold a hearing or whether to revoke probation rests within the sound discretion of the department, and there must be evidence that the department acted with full knowledge of the facts on a basis consistent with the purposes of probation and consistent with the applicable law.

The argument that there must be a specific finding that the defendant is not a "good risk" and that such a finding must be a specific element discussed in the order of the secretary comes initially from *Morrissey v. Brewer* (1972), 408 U. S. 471, 483, 92 Sup. Ct. 2593, 33 L. Ed. 2d 484, wherein the court stated:

"Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts."

In that case, the United States Supreme Court, addressing itself specifically to the revocation of either parole or probation after it has once been granted, stated:

"Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain

his liberty as long as he substantially abides by the conditions of his parole. The first step in a revocation decision thus involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation? The first step is relatively simple; the second is more complex. The second question involves the application of expertise by the parole authority in making a prediction as to the ability of the individual to live in society without committing antisocial acts. This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were. Yet this second step, deciding what to do about the violation once it is identified, is not purely factual but also predictive and discretionary." (Pp. 479, 480)

*State v. Fuller* (1973), 57 Wis. 2d 408, 414, 204 N. W. 2d 452, also uses the term, "good risk." In *Fuller,* where it was evident that the terms of the probation had been violated, we said:

"The only question before Judge COFFEY was whether or not the defendant, given his past conduct of violating the conditions of his probation, was still a 'good risk.' "

While this term has been used in Wisconsin cases and has been used in numerous other cases throughout the country, no case which we have found or which has been brought to our attention clearly explains the meaning of the term, "good risk." We do not consider the term, "good risk," a word of art that encompasses within it any concept of a clearly defined nature. The most that can be said for the term is that it is a shorthand expression which admonishes courts or administrative agencies that, before revoking probation, there should be the exercise

of discretion in respect to whether the rehabilitation of the criminal can continue to successfully be accomplished outside of the prison walls. The Department of Health & Social Services contends in its brief that:

". . . the 'risk' envisioned is broader than a risk that the probationer will commit more crime, or not obtain work, or violate other conditions. The 'risk' encompasses all of these as well as the public interests in the imposition of punishment and specific and general deterrence . . . ." (P. 6)

We have no dispute with the department's definition as far as it goes, but we also believe that the additional question is posed: Will the continued probation be likely to further the rehabilitation of the criminal or will that rehabilitation be furthered by placing him in a closed society.

We conclude that the guidelines recommended by the American Bar Association *Standards Relating to Probation* properly set forth the duty of a court or administrative body in exercising its discretion in respect to possible revocation of probation:

"5.1 **Grounds for and alternatives to probation revocation.**
"(a) Violation of a condition is both a necessary and a sufficient ground for the revocation of probation. Revocation followed by imprisonment should not be the disposition, however, unless the court finds on the basis of the original offense and the intervening conduct of the offender that:
"(i) confinement is necessary to protect the public from further criminal activity by the offender; or
"(ii) the offender is in need of correctional treatment which can most effectively be provided if he is confined; or
"(iii) it would unduly depreciate the seriousness of the violation if probation were not revoked.
"(b) It would be appropriate for standards to be formulated as a guide to probation departments and courts in processing the violation of conditions. In any

event, the following intermediate steps should be considered in every case as possible alternatives to revocation:

"(i) a review of the conditions, followed by changes where necessary or desirable;

"(ii) a formal or informal conference with the probationer to re-emphasize the necessity of compliance with the conditions;

"(iii) a formal or informal warning that further violations could result in revocation." American Bar Association, *Standards Relating to Probation,* pp. 15, 16, 56, 57.

We approve of these standards and adopt them.

The standards, to which the appellant refers with approval, point out that the violation of a condition is a "sufficient ground for the revocation of probation." Accordingly, under those standards, as well as under the Wisconsin statutes, the factual determination that a violation of a condition has occurred triggers the exercise of the revoking authority's jurisdiction to revoke or not in its discretion. Here, the jurisdictional question is undisputed both as to a factual underpinning and the due process sequence of events that led to the ultimate decision by the secretary.

The order of the secretary recited that he had before him the whole record, the examiner's summary of the evidence and the examiner's recommendation. The record is undisputed, therefore, that, prior to the time the secretary reached his decision, he had full knowledge of the facts as arrived at after a due process procedure. This element of discretion, an important one, demonstrates that the action was based upon consideration of the relevant facts rather than upon caprice.

Discretion not only entails the process of decision making on the basis of the relevant facts but also requires that the decision be consonant with the purposes of the established law or other guides to discretion. In the instant case the secretary, after an examination of the

record, stated that the violation was not an isolated one, but was repeated upon three occasions. Thus, the secretary, applying the "expertise" recognized in *Morrissey,* concluded that, "Continued supervision is not possible unless rules are adhered to." We believe this to be another way of expressing guideline 5.1 (a) (iii) of the American Bar Association *Standards Relating to Probation* to the effect that the failure to revoke under the circumstances, "would unduly depreciate the seriousness of the violation."

The evidence elicited at the hearing supports the position of the secretary that the adherence to the condition that was violated was an important—probably the most important—condition of probation. The Clock Bar was the scene of the defendant's commercial gambling activities. The trial judge, with good reason, believed that the persons with whom Plotkin was associating at the time of his crime were habitues of the Clock Bar. The prohibition against entering the bar was totally unrelated to the question of whether liquor was then being served. The evidence at trial and on the hearing for revocation showed that his commercial gambling offenses were on occasion committed on the Clock Bar premises before the bar was opened for service of liquor. This was not a nominal condition that was violated. Rather, the condition was one that went to the heart of the defendant's criminal activities. On oral argument counsel attempted to portray the condition itself as being unreasonable because Plotkin merely went into the bar to pick up his mail. The record reveals, however, the degree to which the presence of Plotkin in this particular bar has been inextricably intertwined with his criminal conduct.

It is also argued that Plotkin was not a man of violence, and that, therefore, he was not a risk to others or to society as a whole. The record bears out that Plotkin is

probably unlikely physically to assault anyone, but the legislature has seen fit to conclude that gambling of the nature indulged in by Plotkin is a threat to society and to other citizens who may become enmeshed in the toils of the commercial gambler. Plotkin's return to his "locus operandi" contrary to the conditions of probation constituted a threat to society, to others, and to his own chances of rehabilitation. We do not look upon Plotkin's admission to his probation officer that he was going into the Clock Bar as evidence of openness or cooperation. Rather, it evinces a brazen disregard of the conditions to which he had voluntarily agreed as a portion of his plea bargaining agreement. We give him no plusses for the assertion to the probation officer that he was continuing to go into the bar because he felt the condition was "unconstitutional" and could not be enforced. He demonstrated a callous disregard for the court's judgment and decided to take the law and its interpretation into his own hands. Had he wished to challenge the condition, it would not have been necessary to defy the admonition of his probation officer, but that is what Plotkin did.

We conclude that the secretary properly and in the exercise of due discretion revoked the probation of Plotkin. He summarized those considerations in the sentence that "Continued supervision is not possible unless rules are adhered to."

In view of the fact that the whole record was before the department secretary, including information in respect to the original offense and the reason for the imposition of the condition that the Clock Bar was not to be entered, it is apparent that the revocation was not the result of a capricious, arbitrary, and ironclad "no second chance" rule or the adherence to a rule for rule's sake. Here the condition that was violated went to the heart of the rehabilitative process and was integrally related

to the risk that Plotkin would indulge in his old criminal habits to his detriment and the detriment of society.

We affirm the order of the trial court which in effect quashed the writ of certiorari and affirmed the revocation.

*By the Court.*—Order affirmed.