STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Clayborn L. WALKER,
Defendant-Appellant.
[Case No. 2006AP562-CR.]†

STATE of Wisconsin EX REL. Clayborn WALKER,
Petitioner-Appellant,††

v.

Matthew J. FRANK, Secretary,
Wisconsin Department of Corrections,
Respondent-Respondent.
[Case No. 2006AP1738.]

Court of Appeals

*Nos. 2006AP562–CR, 2006AP1738.*
*Submitted on briefs April 3, 2007.*
*—Decided May 8, 2007.*

2007 WI App 142

(Also reported in 735 N.W.2d 582.)

† Petition to review filed.
†† Petition to review denied 9/10/07.

On behalf of the defendant-appellant and petitioner-appellant, the cause was submitted on the briefs of *Amelia L. Bizzaro* of *Henak Law Office, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent and respondent-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Stephen W. Kleinmaier*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Kessler, JJ.

¶ 1. FINE, J. This is a consolidated appeal. In appeal number 06AP1738, Clayborn L. Walker appeals the order of the circuit court, the Honorable Richard J. Sankovitz, presiding, denying his petition for a writ of habeas corpus challenging the revocation of his extended supervision. In appeal number 06AP562–CR, Walker appeals an order of the circuit court, the Honorable John A. Franke, presiding, reconfining him for two years. *See* WIS. STAT. § 302.113(9)(am) (reconfinement). We affirm the order entered in appeal number 06AP1738, but reverse, as we are required to do, the order in appeal number 06AP562–CR. *See State v. Gee*, 2007 WI App 32, ¶ 15, 299 Wis. 2d 518, 529, 729 N.W.2d 424, 430 (discussed in ¶ 30 below).

I. APPEAL FROM THE DENIAL OF
WALKER'S PETITION FOR WRIT OF HABEAS CORPUS.

A.

¶ 2. In May of 2003, Walker pled guilty to armed robbery with the use of force, as a party to a crime. *See* WIS. STAT. §§ 943.32(2), 939.05 (2001–02). According to the criminal complaint, Walker and a friend accosted a man at gun point, took the man's car keys, and were going to drive away, when the grandmother of the victim's girlfriend came out of her house in front of which the car was parked and scared them away. The complaint asserts that Walker's friend had the gun and hit the victim with it when the victim at first would not surrender the keys. The sentencing court, the Honorable Jean W. DiMotto, presiding, imposed two years of initial confinement followed by four years of extended

supervision. *See* WIS. STAT. § 973.01 (bifurcated sentences of initial confinement and extended supervision).

¶ 3. Walker was released on extended supervision on either October 26, 2004, or October 28, 2004 (the documents in the Record conflict on this point). Within weeks, he violated the rules of his supervision and also absconded. He was ultimately arrested, and his extended-supervision agent recommended revocation of his extended supervision on the following grounds, notice of which was given to Walker in writing:

- On November 11, 2004, Walker "failed to be home for a scheduled home visit."

- On November 11, 2004, Walker changed "his residence without prior approval from his agent."

- On November 15, 2004, Walker "failed to report to his agent for a scheduled office visit."

- On November 23, 2004, Walker "failed to report to his agent for a scheduled office visit."

- On November 23, 2004, Walker absconded from extended supervision and "his whereabouts and activities remained unknown until his arrest on 02/23/05."

- Walker resisted his arrest on February 23, 2005, "by running from officers and struggling with officers during the arrest procedure."

Walker admitted five of the six violations, denying that he fought with the officers.

¶ 4. The notice form advised Walker of his right to both a preliminary and final revocation hearing, and also explained that although there were almost four

years left on his sentence, Walker's agent recommended that Walker be re-incarcerated for only two of the almost four years. As material to Walker's appeal, the form also had a paragraph saying:

> After having been informed of my rights, *including the right to have alternatives to revocation considered at the final revocation hearing,* I hereby waive all right to be heard at both the final revocation hearing and the good time forfeiture/reincarceration hearing. . . . I further understand this will result in the Department making a decision upon information prepared by the Probation/Parole Agent, and that this waiver will probably result in revocation and imprisonment.

(Emphasis added.) Walker's agent read the paragraph to Walker, Walker signed the form immediately beneath the paragraph, and the agent witnessed his signature. They signed the form on April 12, 2005. The lawyer who represented Walker for the revocation proceedings, Donald C. Dudley, was with Walker when the agent read the paragraph to him and when Walker and the agent signed it.

¶ 5. The crux of Walker's complaint in connection with his appeal from the circuit court's denial of his petition for a writ of habeas corpus is that Dudley ineffectively represented him because, according to Walker, Dudley did not, as phrased by Walker's brief-in-chief, "explain to Walker his right to present possible alternatives to revocation," and, also, because Dudley did not investigate alternatives to revocation to present to the administrative law judge who would preside at the final revocation hearing. Further, Walker claims that his agreement to waive a final revocation hearing was not voluntary because, again as phrased by Walker's brief-in-chief, "he was never advised that, despite his admissions to the factual allegations, alter-

natives could be presented at the final revocation hearing." He does not allege that his admissions to the violations were not voluntary.

¶ 6. The circuit court held an evidentiary hearing on Walker's contentions and issued a written decision explaining why it was denying Walker's petition. The circuit court found that Dudley met with Walker twice, on April 5, 2005, and on April 12, 2005, to discuss the revocation proceedings, and that at the April 5 meeting Dudley "discussed Mr. Walker's case and their strategy in depth."[1] The circuit court also found that given the realities of what they faced, "Mr. Walker and Mr. Dudley focused their strategy not on avoiding revocation but on minimizing the length of reconfinement," and that this strategy was chosen at least in part by Dudley's discovery before the revocation hearing that they would have to appear before an administrative law judge whom Dudley knew was tough on absconders. This is what the circuit court found:

> Her assignment dismayed them [Walker and Dudley], because Mr. Dudley's experience led him to believe that if Mr. Walker challenged his revocation, the [administrative law] judge not only would revoke Mr. Walker for absconding but also recommend [to the reconfinement circuit court] a period of reconfinement in prison that exceeded the two-year recommendation his agent was making.

Significantly, the administrative law judge assigned to preside over Walker's final revocation hearing had guidelines for lawyers appearing before her that warned that they "need to weigh the risks and benefits

---

[1] Various parts of the circuit court's written decision refer to the April dates as either being in "2005" or "2006." The "2006" was a typographical error.

of going through with a hearing and communicate this to their clients" because "[i]t is important to remember that [the Division of Hearings and Appeals] is not bound by the Department [of Corrections]'s recommendations. It is not unheard of for [administrative law judges] to exceed the Department [of Corrections]'s recommendations." (Emphasis omitted.)

¶ 7. The circuit court found that although Dudley "did not investigate any particular program that might serve as an alternative to revocation," Dudley did discuss the possibility with Walker's agent, who told Dudley that, as phrased by the circuit court in its written decision, "he believed that an alternative to revocation would demean the seriousness of Mr. Walker's absconding." Accordingly, as found by the circuit court, although Dudley "discussed alternatives to revocation with Mr. Walker, but only in general terms," Dudley "did not pursue the subject because he did not believe he could prevail upon an administrative law judge to entertain an alternative to revocation if Mr. Walker's [extended-supervision] agent was unwilling to join in the request." Thus, "Mr. Dudley did not discuss with Mr. Walker the possibility that the administrative law judge might grant an alternative to revocation over the objection of the agent because Mr. Dudley considered that possibility extraordinarily unlikely." Indeed, as required by *State ex rel. Plotkin v. Department of Health & Social Services*, 63 Wis. 2d 535, 544–545, 217 N.W.2d 641, 645–646 (1974), Walker's extended-supervision agent made an alternative-to-revocation analysis, and determined that revocation was "justified" for the following reasons: (1) Walker's "[c]onfinement in a structured correctional setting is necessary to protect the community"; (2) Walker's "[c]onfinement in a structured correctional setting is necessary in order to address [his]

treatment needs" because "Walker has shown that he is unable or unwilling to cooperate with community supervision making it impossible for Mr. Walker to receive these treatment needs within the community"; and (3) Walker's almost immediate failure to comply with rules of his extended supervision meant that "[i]t would unduly depreciate the seriousness of the violations if [Walker]'s supervision were not revoked," and that "[f]ailure to revoke will send a negative message to all offenders and the community."

¶ 8. The circuit court also found that Dudley "advised Mr. Walker that if he agreed to waive his revocation hearing, the [administrative law] judge might temper her recommendation, in the way that judges sometimes credit defendants who accept responsibility rather than forcing the State to prove their guilt." The circuit court also rejected Walker's testimony that no one read the waiver form to him before he signed it, crediting Dudley's testimony that the agent did read it, and that this was consistent with Dudley's practice of asking agents to read to his clients the rights that they were giving up by waiving their right to a hearing.

¶ 9. In sum, the circuit court found that: "Mr. Walker, on Mr. Dudley's recommendation, decided to waive his revocation hearing and agree to the revocation of his extended supervision," and determined that Dudley was not ineffective.

B.

¶ 10. To prove ineffective assistance of counsel, a person in a criminal case must show: (1) deficient performance by his or her lawyer, and (2) prejudice.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, the person must point to specific acts or omissions of the lawyer that are "outside the wide range of professionally competent assistance." *Id.*, 466 U.S. at 690. There is a "strong presumption that counsel acted reasonably within professional norms." *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990).

¶ 11. To satisfy the prejudice aspect of *Strickland*, the person seeking relief must demonstrate that the lawyer's errors were sufficiently serious to deprive the person of a fair proceeding and a reliable outcome, *Strickland*, 466 U.S. at 687, and "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome," *id.*, 466 U.S. at 694.

¶ 12. An ineffective-assistance-of-counsel claim presents mixed questions of law and fact for appellate review. *Johnson,* 153 Wis. 2d at 127, 449 N.W.2d at 848. A circuit court's findings of fact will not be disturbed unless they are clearly erroneous. *Ibid.* Walker does not contend that any of the circuit court's findings of fact are clearly erroneous. Conclusions by the circuit court whether the lawyer's performance was deficient and, if so, prejudicial, present questions of law that we review *de novo. Id.*, 153 Wis. 2d at 128, 449 N.W.2d at 848. Finally, we need not address both *Strickland* aspects if the person asserting an ineffective-assistance-of-counsel claim fails to make a sufficient showing on either one. *Strickland*, 466 U.S. at 697.

¶ 13. As we have seen, Walker claims that Dudley faltered in his representation: (1) by advising him that he should give up his right to a revocation hearing, and (2) by not investigating alternatives to revocation so they could be presented to the administrative law judge at the hearing. Additionally, Walker claims that his decision to waive the revocation hearing was not voluntary because he says he did not know that he could present to the administrative law judge proposed alternatives to revocation even though he admitted five of the six violations. We discuss Walker's contentions in turn.

¶ 14. Dudley's decision to advise Walker to waive the revocation hearing is within the core of a lawyer's responsibility to devise the best strategy to protect a client's interests. Indeed, this is the very reason lay persons need legal representation—"to obtain an independent opinion on whether, under the facts and applicable law" a decision to give up a right is "wise." *Iowa v. Tovar*, 541 U.S. 77, 87 (2004) (guilty plea). This was especially true here, where the administrative law judge's practice guidelines for lawyers reflected a significant possibility that not waiving a revocation hearing might result in a confinement recommendation exceeding that proposed by the extended-supervision agent.

¶ 15. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. The issue is, therefore, whether Dudley's reliance on what he knew was the adamant opposition to alternatives to revocation by the agent following the agent's *Plotkin* analysis, and Dudley's assessment that

the administrative law judge who would preside over the revocation hearing would almost never consider alternatives for absconders, especially in face of the agent's opposition, and Dudley's desire to get for Walker at least the perception that Walker was being cooperative so as to lessen the chance that the administrative law judge's recommendation to the reconfinement court would be more severe than the agent's two-year recommendation, made his decision not to explore alternatives to revocation deficient performance. We agree with the circuit court that it did not.

¶ 16. As *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), explains:

> [W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

This is akin to the situation here. We agree with the circuit court's assessment that, based on its findings of fact, the likelihood that the alternatives to revocation identified by Walker at the evidentiary hearing on his petition for a writ of habeas corpus would have been accepted by the administrative law judge *in lieu* of

revocation was virtually nil. As the circuit court explained in its written decision:

> The types of programs Mr. Walker might have offered to the administrative law judge (those outlined in the testimony of Sarah DiPadova [who described herself at the hearing as "a sentencing advocate at the Benedict Center"] such as anger management, family nurturing, job skills training and [general education degree] prep) do not seem targeted at Mr. Walker's most salient challenge: following the rules of supervision. To the contrary, success in those programs would depend on Mr. Walker's willingness to adhere to the program, a willingness that proved lacking in him almost as soon as he was released from prison. One of the programs Ms. DiPadova's research featured was targeted at the problem on which Mr. Walker blames all his woes – getting phone service – but I am not persuaded that offering this alternative would have had any reasonable chance of changing the outcome of Mr. Walker's revocation. Mr. Walker's absconding was so immediate and so complete and persisted for so long, and therefore evidenced not merely an inability to cooperate [because of the lack of telephone service] but a true defiance of supervision, that I do not believe a reasonable administrative law judge could have trusted Mr. Walker to be released again.

(Parentheses in original; bracketed material added.)

■

¶ 17. A lawyer's failure to investigate is not deficient performance if he or she reasonably concludes, based on facts of record, that any investigation would be mere wheel-spinning and fruitless. *See Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) ("[W]hen there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged

as unreasonable.' ") (quoting *Strickland*, 466 U.S. at 691, in a slightly different context). Based on the circuit's findings of fact, this is the situation here.[2] Accordingly, as did the circuit court, we conclude that Walker has not demonstrated that the reliability of the revocation proceedings was impaired when Dudley made the strategic decision that it would be best for Walker if Walker waived his right to a revocation hearing. Further, the notice Walker signed specifically told him that he had "the right to have alternatives to revocation considered at the final revocation hearing," if he chose not to waive that hearing, and nothing in the paragraph or the notice as a whole indicated that the fact that he had admitted to five of the six violations alleged by the agent would negate that right. Thus, Walker's contention that his waiver of the hearing was not voluntary because he claims not to have known that he could, despite his admissions, still present the ad-

___

[2] Indeed, as the circuit court noted in its written decision, in Walker's reply brief submitted to the circuit court, Walker admitted that "[w]hat the [administrative law judge] would or would not do if faced with proposed [alternatives to revocation] is speculative at best . . . pure guesswork," contending that the possible result was "not part of the analysis in the least." In support of that contention, Walker cited *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), which held that it was not *per se* deficient performance for a lawyer in a criminal case to not file a notice of appeal without first discussing the matter with his or her client. *Id.*, 528 U.S. at 476–481. Further, *Flores-Ortega* specifically recognized that even where the lawyer does not consult with the client before not filing a notice of appeal, prejudice will not be presumed: "we require the defendant to demonstrate that, but for counsel's deficient conduct, he would have appealed." *Id.*, 528 U.S. at 486. *Flores-Ortega* is not on point and, significantly, Walker does not cite *Flores-Ortega* in his appellate briefs.

ministrative law judge with suggested alternatives to revocation borders on the frivolous. We affirm the circuit court's order denying Walker's petition for a writ of habeas corpus.

## II. Appeal of the Circuit Court's Reconfinement Order.

### A.

¶ 18. After his extended supervision was revoked, Walker appeared before the circuit court, the Honorable John A. Franke, presiding, for his reconfinement hearing. *See* Wis. Stat. § 302.113(9)(am) ("If the extended supervision of the person is revoked, the person shall be returned to the circuit court for the county in which the person was convicted of the offense for which he or she was on extended supervision, and the court shall order the person to be returned to prison for any specified period of time that does not exceed the time remaining on the bifurcated sentence."). At the outset of the hearing, the circuit court indicated that it had reviewed a "court memo" from Walker's extended-supervision agent to Judge DiMotto, who, as we have seen, was the sentencing judge. (Uppercasing omitted.) The memorandum indicated that upon his conviction of armed robbery with use of force, Walker had been sentenced to two years of initial confinement to be followed by four years of extended supervision, and recounted the "violations prompting revocation," including the allegation that Walker did not admit the resisting arrest violation. (Uppercasing omitted.) Walker does not contend on appeal that the reconfinement court relied on inaccurate information. *See State v. Johnson*, 158 Wis. 2d 458, 468, 463 N.W.2d 352, 357 (Ct. App. 1990) ("Defendants have a due process right to be sentenced on the basis of accurate information.").

752

¶ 19. The agent's memorandum to the circuit court noted in discrete sections Walker's less-than-cooperative history on extended supervision, the agent's *Plotkin* analysis as to whether revocation was justified or whether alternatives to revocation were appropriate, and the alternatives to revocation that the agent and his supervisor considered. The memorandum also had a one-page, single-spaced explanation of why the agent was recommending that Walker be reconfined for two years out of the nearly four years remaining on his sentence. *See* Wis. Stat. § 302.113(9)(at) ("When a person is returned to court under par. (am) after revocation of extended supervision, the reviewing authority shall make a recommendation to the court concerning the period of time for which the person should be returned to prison. The recommended time period may not exceed the time remaining on the bifurcated sentence, as calculated under par. (am).").[3] Summarizing, the agent recounted the facts underlying the armed robbery, and pointed out that Walker:

- "had a negative institutional conduct record," accumulating "2 major and 15 minor conduct reports when incarcerated, one of these conduct reports was due to sexual conduct";

- had "absconded from supervision" "less than 3 weeks" after he was released on extended supervision; and

---

[3] Wisconsin Stat. § 302.113(9)(am) provides, as material: "The time remaining on the bifurcated sentence is the total length of the bifurcated sentence, less time served by the person in confinement under the sentence before release to extended supervision under sub. (2) and less all time served in confinement for previous revocations of extended supervision under the sentence."

- had "a negative adjustment to his supervision" as revealed by the violations for which his extended supervision was revoked.

The memorandum advised that the agent and two of his supervisors had agreed that reconfinement was "necessary to protect the public, prevent depreciation of the offense [presumably Walker's absconding and his other violations of the rules of extended supervision], and/or provide treatment in a confined setting," and that the agent and his supervisors believed that a reconfinement of two years was "adequate to accomplish" the goals they identified. The memorandum attached the form that reified Walker's waiver of his final revocation hearing and in which Walker, as we have already seen, specifically recognized that waiver of the hearing also relinquished his "right to have alternatives to revocation considered at the final revocation hearing."

¶ 20. Before imposing a reconfinement order, the circuit court heard from the prosecutor, Dudley (who was Walker's lawyer for the reconfinement hearing as well) and Walker. The prosecutor recounted Walker's criminal record, which, according to what the prosecutor told the circuit court, included a juvenile-court referral "for second degree sexual assault of a child," which "was resolved as a disorderly conduct." There were also juvenile referrals for: three incidents of driving a "vehicle without owner's consent," an incident of "fleeing," and an incident of possessing marijuana within 1,000 feet of a school with the intent to deliver. The prosecutor also told the circuit court that Walker's "agent had indicated [that Walker] claimed he had not used drugs since 2002." Further, the prosecutor indicated that Walker's record revealed that a warrant had to be issued "for failure to appear," and there was a "fugitive from justice" notation.

¶ 21. The prosecutor also told the circuit court that Walker had been neglected as a child, and was under a "CHIPS [child in need of protection or services —*see* WIS. STAT. § 48.13] order" antedating 1989 (when he was a baby, having been born on October 26, 1984) because the prosecutor indicated that "[i]n 1989 [Walker] was continued in the CHIPS system it appears through 1994 when guardianship was transferred."

¶ 22. Dudley told the circuit court that although he recognized that Walker needed "a message" that would tell him "that hey, when you're on extended supervision, you have to report to your agent, obey all the rules of supervision, and not pick up any new crimes and basically turn your life around," he did not believe the "message" needed reconfinement for two years, and suggested that eight to twelve months would be more appropriate. Dudley also told the circuit court that Walker had a personality conflict with his agent, and that the agent did not help Walker with setting up the electronic monitoring system that was part of Walker's extended-supervision requirements:

> When he was released from prison and he was gonna [sic] be placed on electronic monitoring, he needed to have phone service hooked up. Well, he didn't have a job and there was no money for that to have happened. So he asked his agent for help. Now, his agent didn't really give him any help and I did talk with the agent and the agent basically says, well, it's up to him to get his own services and I understand that the offenders do need to do their share of the work. But when you're just out of prison and you don't have a job and your agent's telling you if you don't get phone service hooked up, I'm putting you back in jail [sic], it put [Walker] in a position where I'm not getting help

from my agent. I don't have any money. What am I gonna [*sic*] do? He's gonna [*sic*] lock me up anyways [*sic*].

¶ 23. Walker then spoke to the circuit court, and explained he "never cut my bracelet off and it was several times that I made an attempt call [*sic*] to get in contact with my [agent] about the phone because he gave us a deadline time which he didn't mention." Walker also asked for leniency because "I got a baby on the way and I would like to be out to be home with my baby." When the circuit court asked Walker about the "Challenge Incarceration Program, the Boot Camp Program which I believe you were found eligible for at the time of the sentencing," Walker replied that he "didn't take it" even though "it was offered."

¶ 24. As noted, the circuit court ordered Walker reconfined for two years. Noting that it "was considering more than the two years" recommended by the agent, the circuit court explained that Dudley "has persuaded me that more than that wouldn't accomplish anything clear for the community." In explaining its reconfinement rationale, the circuit court mentioned the following matters it considered:

- Walker's conflict with his agent: "When your agent says you have to do something, you have to do it. Whether you like your agent, whether your agent is polite about it, whether your agent even handles it well or not, you have to put up with it."

- Walker's underlying crime was "serious."

- The neglect Walker suffered throughout his childhood, which, the circuit court surmised, "ha[d] something to do with the juvenile difficulties you had and now the adult difficulties you're having."

756

- Absconding was not a solution to whatever difficulties Walker was having with his agent. "You served two years. You got out and you blew it immediately and you blew it in a big way. You didn't commit a new offense, at least no major offense, and there is no case pending. But short of committing a new crime, you blew it about as much as a person can."

The circuit court concluded by noting that "the message has to be sent and anything less than half of the reconfinement time would be insufficient." The circuit court also indicated the "Boot Camp Program" was "still an option" that was "up to the department."

¶ 25. In denying Walker's motion for post-reconfinement relief that asserted that it had erred in not reviewing the original sentencing transcript, the circuit court issued a written decision that addressed that concern:

> The defendant is correct that the record does not reflect whether I had reviewed the initial sentencing transcript or was specifically aware of his mental health history. It was my general reconfinement practice to review at least the judges' sentencing comments. I would sometimes review more of the transcript depending on the particular circumstances of the case and the arguments advanced by counsel. I do not recall whether I reviewed this particular transcript and note that Judge DiMotto's sentencing remarks did not reference the mental health background.

The circuit court's written decision indicated that it had "now reviewed the sentencing transcript in connection with [Walker]'s new factor claim and" determined that "modification is not warranted."[4]

---

[4] Walker had contended that "documentation revealing that Walker completed programming in prison, was working towards

## B.

¶ 26. Walker's brief-in-chief on this appeal argues that we should reverse the circuit court's reconfinement order and remand for a new reconfinement hearing "because there is nothing in the record to indicate that the reconfinement court took into account the factors weighed at Walker's original sentencing hearing." (Uppercasing omitted.) Although his reply brief asserts, for the first time on this appeal in an undeveloped argument, that Dudley was also ineffective at the reconfinement hearing, we generally do not consider matters raised for the first time in a reply brief, and will not do so here. See *Sisters of St. Mary v. AAER Sprayed Insulation*, 151 Wis. 2d 708, 723–724 n.4, 445 N.W.2d 723, 729 n.4 (Ct. App. 1989) (appellate court will not review an issue raised for the first time in a reply brief).

¶ 27. As both Walker and the State recognize, Walker's contention that a new reconfinement hearing is necessary turns on *State v. Brown*, 2006 WI 131, 298 Wis. 2d 37, 725 N.W.2d 262, which held that where the reconfinement court did not impose the original sentence, the reconfinement court should review the original sentencing transcript. *Id.*, 2006 WI 131, ¶¶ 21, 38, 298 Wis. 2d at 50, 58, 725 N.W.2d at 268, 272 ("The original sentencing transcript is an important source of information on the defendant that discusses many of the factors that circuit courts should consider when making a reconfinement decision. The original sentencing transcript is readily available for a circuit court to examine, and those portions that are considered by the court to be relevant should be mentioned."). *Brown*

his education and suffered from dyslexia," were new factors. He does not assert a new-factor argument on this appeal.

recognized, however, "that not all the factors [set out in the decision] will apply in every case," and that it was not establishing a "required checklist that must be followed in every instance." *Id.*, 2006 WI 131, ¶¶ 39, 45, 298 Wis. 2d at 58, 61, 725 N.W.2d at 272, 273. Indeed, although the defendant in *Brown* complained, as phrased, in his main brief before the supreme court, that the reconfinement court in that case "did not . . . [i]ndicate whether he read the original sentencing transcript," (Brief of Petitioner-Appellant at 9, *State v. Brown*, 2006 WI 131, 298 Wis. 2d 37, 725 N.W.2d 262 (No. 2005AP584–CR)) and argued that this was error, (Brief of Petitioner-Appellant at 22–26, *Brown*, 2006 WI 131, 298 Wis. 2d 37, 725 N.W.2d 262 (No. 2005AP584–CR)), and everyone briefing *Brown* before the supreme court assumed that the reconfinement court not only did not "indicate" that it had read the original sentencing transcript, but assumed that the reconfinement court had, in fact, *not* read that transcript, *Brown* neither reversed Brown's reconfinement order nor remanded for an evidentiary hearing to determine whether the reconfinement court had read the original sentencing transcript but had merely neglected to say that it had.

¶ 28. *Brown* reaffirmed that the polestar of an appropriate sentence also governs reconfinement orders, and that the ultimate reconfinement order, as with a sentencing determination, rests in the circuit court's reasoned discretion. *Brown*, 2006 WI 131, ¶¶ 7, 22, 26–37, 39, 41, 44–45, 298 Wis. 2d at 44, 50, 52–58, 59, 61, 725 N.W.2d at 265, 268, 269–272, 272, 272–273, 273–274.

¶ 29. Here, as we have seen, the circuit court's reconfinement order was based on its assessment of

Walker's special rehabilitative needs, the seriousness of the underlying crime, the degree of Walker's adjustment while in original confinement and on extended supervision, the time remaining on Walker's original bifurcated sentence, and the Department's recommendation, which it followed. These are appropriate factors. *See id.*, 2006 WI 131, ¶¶ 7, 34, 36, 298 Wis. 2d at 44, 56, 57, 725 N.W.2d at 265–266, 271, 272 (Reconfinement courts should consider: "the nature and severity of the original offense," the Department's recommendation, "the defendant's institutional conduct record, and the defendant's conduct and the nature of the violation of terms and conditions during extended supervision, as well as the amount of incarceration necessary to protect the public from the risk of further criminal activity."); *see also id.*, 2006 WI 131, ¶ 27, 298 Wis. 2d at 53, 725 N.W.2d at 270 ("a main focus of a reconfinement hearing is the defendant's behavior since the imposition of the original sentence"). Additionally, the reconfinement order should be sensitive to the policy that "[t]he court should impose the minimum amount of confinement *which is consistent* with the protection of the public, the gravity of the offense, and the defendant's rehabilitative needs." *Id.*, 2006 WI 131, ¶¶ 7, 34, 298 Wis. 2d at 44, 56, 725 N.W.2d at 265, 271 (emphasis added). We emphasize "which is consistent with the protection of the public, the gravity of the offense, and the defendant's rehabilitative needs" because " 'minimum' does not mean 'exiguously minimal,' that is, insufficient to accomplish the goals of the criminal justice system." *State v. Ramuta*, 2003 WI App 80, ¶ 25, 261 Wis. 2d 784, 800, 661 N.W.2d 483, 490.

¶ 30. Although Walker seeks a *per se* rule requiring that a reconfinement court that did not impose the

original bifurcated sentence examine the original sentencing transcript, *Brown*, as we have seen, specifically eschewed a "required checklist" to be robotically followed, *see Brown*, 2006 WI 131, ¶¶ 39, 45, 298 Wis. 2d at 58, 61, 725 N.W.2d at 272, 273, and as we have also seen, *Brown* affirmed Brown's reconfinement order even though everyone assumed that the reconfinement court had not reviewed the original sentencing transcript. Significantly, Walker does not tell us what in the original sentencing transcript would have added anything to the reconfinement court's comprehensive and sensitive sentencing analysis. *Cf. State v. Flynn*, 190 Wis. 2d 31, 48, 527 N.W.2d 343, 349–350 (Ct. App. 1994). Although we conclude that the circuit court did not erroneously exercise its discretion, this court has held in a decision ordered published on February 28, 2007, *State v. Gee*, 2007 WI App 32, ¶ 15, 299 Wis. 2d 518, 729 N.W.2d 424, 430, that *Brown did* create a *per se* rule, even though *Brown* itself did not so treat its suggestion that reconfinement courts "should consider" the original sentencing transcript. *Brown*, 2006 WI 131, ¶ 38, 298 Wis. 2d at 58, 725 N.W.2d at 272. We are bound by *Gee. See Cook v. Cook*, 208 Wis. 2d 166, 190, 560 N.W.2d 246, 256 (1997) (Court of appeals may not "overrule, modify or withdraw language from a published opinion of the court of appeals."). We respectfully seek clarification from the supreme court as to whether it intended to create a *per se* rule, as *Gee* held, or whether, as we now conclude, it did not. *See Cook*, 208 Wis. 2d at 190, 560 N.W.2d at 256 ("[T]he court of appeals may decide the appeal, adhering to a prior case but stating its belief that the prior case was wrongly decided.").

¶ 31. We affirm the circuit court's order denying Walker's petition for a writ of habeas corpus in appeal number 06AP1738, and, pursuant to *Gee*, we reverse

the circuit court's reconfinement order in appeal number 06AP562–CR, and remand for a new reconfinement hearing.

*By the Court.*—Order reversed; order affirmed.

¶ 32. KESSLER, J. *(concurring).* I agree with the majority conclusion that the denial of the petition for a writ of habeas corpus challenging revocation of extended supervision was proper in this case. Majority, ¶ 31. I also agree with the majority conclusion that the order reconfining defendant must be reversed and remanded for a new reconfinement hearing. Majority, ¶ 31. I write separately because I disagree with the majority argument, Majority, ¶¶ 27 and 30, that our prior decision in *State v. Gee,* 2007 WI App 32, 299 Wis. 2d 518, 729 N.W.2d 424, was inconsistent with the supreme court's holdings in *State v. Brown,* 2006 WI 131, 298 Wis. 2d 37, 725 N.W.2d 262.

¶ 33. In *Gee,* the reconfinement judge was not the sentencing judge. *Id.,* 729 N.W.2d 424, ¶ 4. The reconfinement judge, in explaining the reconfinement decision, did not claim to have reviewed the sentencing trial court's sentencing transcript, the presentence report, or any other original sentencing information, concluding that he was not required to do so under *State v. Jones,* 2005 WI App 259, 288 Wis. 2d 475, 707 N.W.2d 876. *Gee,* 729 N.W.2d 424, ¶ 6. The reconfinement judge explained the time he imposed in terms frequently heard in the context of an original sentencing hearing, *i.e.,* the reconfinement court mentioned "a true protection of society issue," and "a need to punish sufficiently so you're finally deterred," concluding that "all I can tell you is that all we're going to be doing is protecting society . . . ." *Id.,* ¶ 5.

¶ 34. As we observed in *Gee*, "[i]n *Brown*, the court . . . imposed on trial courts the requirement that they 'provid[e] reasoned explanations for reconfinement decisions.' " *Gee*, 729 N.W.2d 424, ¶ 10 (citing *Brown*, 729 N.W.2d 424, ¶ 28) (modification in *Gee*). To provide those reasoned explanations, the court in *Brown* discusses a number of *factors*[1] that may be relevant, *see id.*, ¶¶ 34–36, and explains "[t]hese *factors* are not a mandatory checklist, and we do not hold that a circuit court must examine each *factor* on the record in every case," *id.*, ¶ 37 (emphasis added). The *Brown* court then explains what it is important to review in order to examine the relevant *factors:*

> The original sentencing transcript is an important source of information on the defendant that discusses many of the factors that circuit courts should consider when making a reconfinement decision. The original sentencing transcript is readily available for a circuit

---

[1] The factors mentioned include:

- "[W]e expect that circuit courts will usually consider the nature and severity of the original offense, the client's institutional conduct record, as well as the amount of incarceration necessary to protect the public from the risk of further criminal activity . . . the defendant's conduct and the nature of the violation of terms and conditions during extended supervision." *Brown*, 2006 WI 131, ¶ 34, 298 Wis. 2d 37, 725 N.W.2d 262.

- "[W]hat balance of time between renewed incarceration and further parole [extended] supervision is most likely to protect society and at the same time to facilitate the violator's transition between prison and unconditional freedom." *Brown*, 725 N.W.2d 262, ¶ 35 (citation and internal quotation marks omitted).

- "Other factors that may be relevant . . . in making reconfinement decisions include . . . the defendant's record, attitude, and capacity for rehabilitation, and the rehabilitative goals to be accomplished by imprisonment . . . in relation to the time left on the violator's original sentence." *Brown*, 725 N.W.2d 262, ¶ 36.

court to examine, and *those portions that are considered by the court to be relevant should be mentioned.*

*Id.,* ¶ 38 (emphasis added). One can only wonder how a reconfinement judge who did not impose the original sentence could comply with the supreme court's clear instruction to examine the relevant factors the court described in *Brown,* much less mention those portions of the sentencing transcript which are relevant to those factors, unless the sentencing transcript has been reviewed.

¶ 35. The majority's argument, based upon the briefs in *Brown* (which were obviously reviewed by the supreme court before releasing its opinion), *see* Majority, ¶ 27, suggests that the supreme court's decision not to remand was somehow an approval of a reconfinement judge not reading a readily available sentencing transcript. In my view, this ignores the court's specific explanation for the lack of a remand: "Since this court has not, until now, set forth any guidance as to the factors that circuit courts should consider in making reconfinement decisions, we hold that the circuit court, in this case, did not erroneously exercise its discretion . . . ." *Brown,* 725 N.W.2d 262, ¶ 41.

¶ 36. In *Gee,* the record did not indicate that the reconfinement judge reviewed any original sentencing material. In the case before us, the reconfinement judge reviewed only what the majority describes as a "court memo" from Walker's extended-supervision agent, Majority, ¶ 18, and took statements from the State and Walker's trial counsel, Majority, ¶¶ 20–22. The trial court was unable to say that it reviewed the sentencing transcript before the reconfinement hearing. Majority, ¶ 25. Thus, in this case, as in *Gee,* the reconfinement

764

court did not review any relevant original sentencing information. Consequently, as in *Gee, Brown* requires remand for a new reconfinement hearing.